484 F.2d 215
 Ronald BRADLEY et al., Plaintiffs-Appellees,
v.
William G. MILLIKEN, Governor of Michigan, etc.; Board of
Education of the City of Detroit, Defendants-Appellants,
and
Detroit Federation of Teachers Local 231, American
Federation of Teachers, AFL-CIO,
Defendant-Intervenor-Appellee,
and
Allen Park Public Schools et al., Defendants-Intervenors-Appellants,
and
Kerry Green et al., Defendants-Intervenors-Appellees.
 Nos. 72-1809-72-1814.
 United States Court of Appeals,
Sixth Circuit.
 June 12, 1973.
Certiorari Granted Nov. 19, 1973.
See 94 S.Ct. 538.
 
 Frank J. Kelley, Atty. Gen., Robert A. Derengoski, Sol. Gen., Lansing, Mich., George T. Roumell, Jr., Louis D. Beer, Russ D. Boltz, William M. Saxton, Detroit, Mich., Robert J. Lord, Fair Haven, Mich., for appellants.
 Ralph B. Guy, Jr., U. S. Atty., David L. Norman, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for intervenor, United States.
 Richard P. Condit, Bloomfield Hills, Mich., for intervenor, Southfield Public Schools.
 Alexander B. Ritchie, Detroit, Mich., for intervenor, Denise Magdowski, and others.
 Theodore Sachs, Ronald R. Helveston, Detroit, Mich., for intervenor, Detroit Federation.
 William M. Saxton, John B. Weaver, Robert M. Vercruysse, X. Orhan, Detroit, Mich., for intervenor, Allen Park Public Schools.
 Douglas H. West, Robert B. Webster, Detroit, Mich., for intervenor, Grosse Pointe Public Schools.
 Kenneth B. McConnell, Bloomfield Hills, Mich., for intervenor, School District of City of Royal Oak.
 William T. Downs, Detroit, Mich., for Inter-Faith Centers for Racial Justice, Inc., amicus curiae.
 Theodore W. Swift, Foster, Lindemer, Swift & Collins, Lansing, Mich., Irwin Ellman Levin, Levin, Garvett, & Dill, Detroit, Mich., for intervenor, Michigan Education Assn.
 Louis R. Lucas, William E. Caldwell, Ratner, Sugarmon & Lucas, Memphis, Tenn., J. Harold Flannery, Paul R. Dimond, Robert Pressman, Cambridge, Mass., Bruce A. Miller, Lucille Watts, Detroit, Mich., Jack Greenberg, Norman J. Chachkin, New York City, E. Winther McCroom, Cincinnati, Ohio, Nathaniel R. Jones, New York City, for appellees.
 Before PHILLIPS, Chief Judge, and WEICK, EDWARDS, CELEBREZZE, PECK, McCREE, MILLER, KENT and LIVELY, Circuit Judges.
 PHILLIPS, Chief Judge, delivered the opinion of the Court, in which EDWARDS, CELEBREZZE, PECK, McCREE and LIVELY, Circuit Judges, joined. WEICK, Circuit Judge (pp. 259-274) and MILLER, Circuit Judge (pp. 283, 284) filed dissenting opinions and KENT, Circuit Judge (pp. 274-283) filed a separate opinion concurring in part and dissenting in part. Circuit Judge KENT died May 28, 1973 after the opinions were in the hands of the printer.
 PHILLIPS, Chief Judge.
 
 
 1
 This is a school desegregation case which, as originally filed, was directed against the school system of Detroit, Michigan, but on this appeal involves both Detroit and school districts located in the surrounding metropolitan area.
 
 
 2
 The present appeal is the fourth time that the case has been before this court since the complaint was filed August 18, 1970. The earlier decisions of this court are reported at Bradley v. Milliken, 433 F.2d 897 (6 Cir. 1970); Bradley v. Milliken, 438 F.2d 945 (6 Cir. 1971); and Bradley v. Milliken, 6 Cir., 468 F.2d 902. cert. denied, 409 U.S. 844, 93 S.Ct. 45, 34 L.Ed.2d 83 (1972). (On November 27, 1972, the original panel dismissed for want of jurisdiction an "emergency motion" by the Detroit Board of Education that State officials be required to provide funds to keep the Detroit public schools operating for 180 regular days of instruction during the current school year.) On February 27, 1973, the Supreme Court denied review in Bloomfield Hills School District v. Roth, West Bloomfield School District v. Roth, and Birmingham School District v. Roth, 410 U.S. 954, 93 S.Ct. 1418, 35 L.Ed. 2d 687. In these cases this court had denied applications for writs of mandamus or prohibition against District Judge Roth. The School Districts contended that the District Judge usurped jurisdiction by failing to convene three-judge courts and by subjecting the Schools Districts to his ruling and order in the school desegregation case in spite of the fact that the Districts were not parties to the desegregation proceedings and had not been found to have committed any act of de jure segregation. The action of the Supreme Court was without prejudice to the right of the School Districts to file application to intervene in the present action.)
 
 
 3
 Oral arguments were heard before a panel of this court on August 24, 1972. An opinion was announced by the panel on December 8, 1972, affirming two orders of the District Court, viz: (1) Ruling on Issue of Segregation, reported at 338 F.Supp. 582, and (2) Findings of Fact and Conclusions of Law on "Detroit only" plans of desegregation, dated March 28, 1972. The decision of the panel vacated the remaining three orders on appeal (enumerated below), but affirmed in principle the ruling of the District Court on the propriety of a metropolitan remedy to accomplish desegregation.
 
 
 4
 On January 16, 1973, this court granted rehearing in banc. Under the provisions of Rule 3(b) of the local rules of this court, the effect of granting rehearing in banc is "to vacate the previous opinion and judgment of the court, to stay the mandate and to restore the case on the docket as a pending appeal."
 
 
 5
 Oral arguments before the court in banc were heard February 8, 1973.
 
 
 6
 No specific desegregation plan has been ordered by the District Court. The procedural history of the litigation is set forth below.
 
 
 7
 Before this court at the present time are four interlocutory orders from which we have granted appeal pursuant to 28 U.S.C. Sec. 1292(b) and one final order, viz:
 
 
 8
 1. Ruling on Issue of Segregation, dated September 27, 1971, reported at 338 F.Supp. 582;
 
 
 9
 2. Findings of fact and conclusions of law on "Detroit only" plans of desegregation, dated March 28, 1972;
 
 
 10
 3. Ruling on Propriety of a Metropolitan Remedy to Accomplish Desegregation of the Public Schools of the City of Detroit, dated March 24, 1972;
 
 
 11
 4. Ruling on Desegregation Area and Development of Plan, and Findings of Fact and Conclusions of Law in support thereof, dated June 14, 1972, 345 F. Supp. 914; and
 
 
 12
 5. Order dated July 11, 1972, directing Michigan State officials to purchase 295 school buses (which this court considers to be a final order).
 
 
 13
 On July 13, 1972, following oral argument, the original panel granted a motion for a temporary stay of the District Court's order of July 11, 1972, ordering the purchase of 295 school buses.
 
 
 14
 On July 17, 1972, following oral argument, the original panel directed that its stay order remain in effect until entry by the District Court of a final desegregation order or until certification by the District Court of an appealable question as provided by 28 U.S.C. Sec. 1292(b).
 
 
 15
 Thereafter, on July 19, 1972, the District Court certified that the orders set forth above involve controlling questions of law, as provided by 28 U.S.C. Sec. 1292(b), and made a determination of finality under Rule 54(b), Fed.R.Civ.P.
 
 
 16
 On July 20, 1972, the original panel entered an order granting the interlocutory appeal concluding that:
 
 
 17
 "[A]mong the substantial questions presented there is at least one difficult issue of first impression that never has been decided by this court or the Supreme Court. In so holding we imply nothing as to our view of the merits of this appeal. We conclude that an immediate appeal may materially advance the ultimate termination of the litigation."
 
 
 18
 The motion for leave to appeal was granted and the case was advanced for oral arguments on the merits on August 24, 1972.
 
 
 19
 The July 20, 1972 order of the original panel included the following stay order, which has remained in effect pending final disposition of the appeal on its merits:
 
 
 20
 "The motion for stay pending appeal having been considered, it is further ORDERED that the Order for Acquisition of Transportation, entered by the District Court on July 11, 1972, and all orders of the District Court concerned with pupil and faculty reassignment within the Metropolitan Area beyond the geographical jurisdiction of the Detroit Board of Education, and all other proceedings in the District Court other than planning proceedings, be stayed pending the hearing of this appeal on its merits and the disposition of the appeal by this court, or until further order of this court. This stay order does not apply to the studies and planning of the panel which has been appointed by the District Court in its order of June 14, 1972, which panel was charged with the duty of preparing interim and final plans of desegregation. Said panel is authorized to proceed with its studies and planning during the disposition of this appeal, to the end that there will be no unnecessary delay in the implementation of the ultimate steps contemplated in the orders of the District Court in event the decision of the District Court is affirmed on appeal. Pending disposition of the appeal, the defendants and the School Districts involved shall supply administrative and staff assistance to the aforesaid panel upon its request. Until further order of this court, the reasonable costs incurred by the panel shall be paid as provided by the District Court's order of June 14, 1972."
 
 
 21
 This court also has granted leave to appeal to various intervening parties and leave to file numerous amicus briefs. The briefs and arguments of all the parties have been considered in the disposition of this appeal.
 
 
 22
 We agree with two of the rulings of the District Court summarized above: (1) The Ruling on the Issue of Segregation and (2) the Findings of Fact and Conclusions of Law on "Detroit only" plans of desegregation. We hold that the findings of fact of the District Court as set forth in these rulings are not clearly erroneous, Rule 52(a), Fed. R.Civ.P., but to the contrary are supported by substantial evidence.
 
 
 23
 As to the District Court's third ruling pertaining to the propriety of a Metropolitan remedy, we agree in part and reverse in part. We vacate this and the two remaining orders and remand to the District Court for further proceedings as hereinafter set forth in detail in this opinion.
 
 I. CHRONOLOGY OF PROCEEDINGS
 
 24
 On April 7, 1970, the Detroit Board of Education adopted a plan to effect a more balanced distribution of black and white students in the senior high schools through enactment of changes in attendance zones involving some 12,000 pupils, to become effective over a three year period. Three months later this modest effort was thwarted by the legislature of the State of Michigan through enactment of Act 48 of the Public Acts of 1970. Section 12 of the Act delayed implementation of the plan. The four members of the Board who supported the April 7 plan were removed from office through a citizen initiated recall election. The new members of the Board and the incumbent members who had orginally opposed the April 7 plan thereafter rescinded it.
 
 
 25
 The complaint in this case was filed by individual black and white school children and their parents, and the Detroit branch of the NAACP against the Board of Education of the City of Detroit, its members, and the then Superintendent of Schools, as well as the Governor, the Attorney General, the State Board of Education and the State Superintendent of Public Instruction of the State of Michigan. (The State of Michigan as such is not a party to this litigation. References thereto should be read as references to the public officials, State and local, through whom the State is alleged or shown to have acted.)
 
 
 26
 The complaint alleged that the Detroit public school system was and is segregated on the basis of race as the result of actions and policies of the Board of Education and of the State of Michigan. The complaint specifically challenged the constitutionality of Act 48 of the Public Acts of 1970 of the State of Michigan, which in effect repealed the April 7, 1970 high school desegregation plan formulated by the Detroit Board.
 
 
 27
 The case was heard originally on plaintiffs' motion for a preliminary injunction to restrain the enforcement of Act 48. In response to this motion the District Judge denied a preliminary injunction, did not rule on the constitutionality of Act 48, but granted the motion of the Governor and Attorney General of Michigan for dismissal of the cause as to them. On appeal this court held that Sec. 12 of Act 48 was an unconstitutional interference with the lawful protection of Fourteenth Amendment rights, that there was no abuse of discretion in denying a preliminary injunction, and that the Governor and Attorney General should not have been dismissed as parties defendant at that stage of the proceeding. The case was remanded to the District Court for an expedited trial on the merits. 433 F.2d 897.
 
 
 28
 On remand plaintiffs moved for immediate implementation of the April 7 plan. On December 3, 1970, following an evidentiary hearing on that plan and two updated plans, the District Court ordered implementation of the "Magnet" or "McDonald" plan effective at the beginning of the next full school year, pending ultimate disposition on the merits. Plaintiffs appealed and filed a motion for summary reversal. This court again held that the District Court had not abused its discretion in refusing to adopt the April 7 plan prior to an evidentiary hearing on the allegations of constitutional violations in the complaint. We remanded the case with instructions to proceed to trial expeditiously on the merits of plaintiffs' allegations concerning the Detroit public school system. 438 F.2d 945. The trial of the case on the issue of segregation began April 6, 1971, and continued until July 22, 1971, consuming 41 trial days. On September 27, 1971, the District Court issued its ruling on the issue of segregation, holding that the Detroit public school system was racially segregated as a result of unconstitutional practices on the part of the defendant Detroit Board of Education and the Michigan State defendants. 338 F. Supp. 582.
 
 
 29
 A decision on a motion to join a large number of suburban school districts as parties defendant was deferred on the ground that the motion was premature, in that no reasonably specific desegregation plan was before the court. The Detroit Board of Education was ordered to submit desegregation plans limited to the City, while State defendants were directed to submit plans encompassing the three-county metropolitan area. An effort was made to appeal these orders to this court. On February 23, 1972, this court held the orders to be non-appealable and dismissed the appeal. 468 F.2d 902, cert. denied, 409 U.S. 844, 93 S.Ct. 45, 34 L.Ed.2d 83 (1972).
 
 
 30
 After further proceedings concerning proposals for a Detroit only desegregation remedy and the presentation of three plans therefor, the District Judge on March 24, 1972, issued a ruling entitled "Ruling on Propriety of Considering a Metropolitan Remedy," and on March 28, 1972, he issued "Findings of Fact and Conclusions of Law on Detroit Only Plans of Desegregation." He rejected all Detroit only plans, saying in part: "Relief of segregation in the public schools of the City of Detroit cannot be accomplished within the corporate geographical limits of the city."Subsequently, the District Court issued an order on June 14, 1972, entitled "Ruling on Desegregation Area and Order for Development of Plan for Desegregation." In this ruling and order the District Court established tentative boundaries for a metropolitan remedy and provided for a panel of nine members to design plans for integration of the Detroit schools and those of 53 metropolitan school districts within certain guidelines. 345 F.Supp. 914.
 
 
 31
 The panel recommended preparatory purchases of school buses prior to implementation of an interim plan in September, 1972. Following a hearing, the District Court on July 11 ordered State defendants to purchase or otherwise acquire 295 school buses.
 
 
 32
 In view of the intervening Congressional action by the enactment of the "Broomfield Amendment," certification was made to the Attorney General of the United States that the constitutionality of Sec. 803 of the Education Amendments of 1972, Pub.L. No. 92-318, 86 Stat. 235, had been called into question. The Department of Justice intervened, filed a brief and participated in the oral arguments before this court.
 
 II. The Issues
 
 33
 All of the parties to this litigation in one form or another present three basic issues which we phrase as follows:
 
 
 34
 1. Are the District Court's findings of fact pertaining to constitutional violations resulting in system-wide racial segregation of the Detroit Public Schools supported by substantial evidence or are they clearly erroneous?
 
 
 35
 2. Based on the record in this case, can a constitutionally adequate system of desegregated schools be established within the geographic limits of the Detroit school district?
 
 
 36
 3. On this record does the District Judge's order requiring preparation of a metropolitan plan for cross-district assignment and transportation of school children throughout the Detroit metropolitan area represent a proper exercise of the equity power of the District Court?
 
 III. The Constitutional Violations
 
 37
 (A) Constitutional violations found to have been committed by the Detroit Board of Education:
 
 
 38
 (1) Segregative zoning and assignment practices.
 
 
 39
 (a) The District Judge found that the Detroit Board of Education formulated and modified attendance zones to create or perpetuate racial segregation. He also found that the feeder system for junior and senior high schools was designed to maintain rather than eliminate black or white schools at the higher levels. Its practice of shaping school attendance zones on a north-south rather than an east-west orientation resulted in attendance zone boundaries conforming to racial dividing lines.
 
 
 40
 (b) He further found that the Detroit Board of Education's policies involved a substantial number of instances of transporting black children past white schools with available school space.
 
 
 41
 He also found that it was the policy of the Board of Education to create optional attendance areas which permitted white students to transfer to all white or predominately white schools located nearer the city limits.
 
 
 42
 The District Judge also found that the policies of the Detroit Board of Education (and State Board of Education) concerning school construction in some instances had the purpose of segregating students on a racial basis and in many others resulted in maintaining or increasing segregation.
 
 
 43
 The District Judge's findings of fact pertaining to alteration of zones and feeder patterns are as follows:
 
 
 44
 "The Board has created and altered attendance zones, maintained and altered grade structures and created and altered feeder school patterns in a manner which has had the natural, probable and actual effect of continuing black and white pupils in racially segregated schools. The Board admits at least one instance where it purposefully and intentionally built and maintained a school and its attendance zone to contain black students. Throughout the last decade (and presently) school attendance zones of opposite racial compositions have been separated by north-south boundary lines, despite the Board's awareness (since at least 1962) that drawing boundary lines in an east-west direction would result in significant integration. The natural and actual effect of these acts and failures to act has been the creation and perpetuation of school segregation. There has never been a feeder pattern or zoning change which placed a predominantly white residential area into a predominately black school zone or feeder pattern. Every school which was 90% or more black in 1960, and which is still in use today, remains 90% or more black." 338 F.Supp. at 588.
 
 
 45
 The legal conclusion of the District Judge is as follows:
 
 
 46
 "5. The Board's practice of shaping school attendance zones on a north-south rather than an east-west orientation, with the result that zone boundaries conformed to racial residential dividing lines, violated the Fourteenth Amendment. Northcross v. Board of Ed. of Memphis, 6 Cir., 333 F.2d 661." 338 F.Supp. at 592-593.
 
 
 47
 ******
 
 
 48
 * * *
 
 
 49
 "9. The manner in which the Board formulated and modified attendance zones for elementary schools had the natural and predictable effect of perpetuating racial segregation of students. Such conduct is an act of de jure discrimination in violation of the Fourteenth Amendment. United States v. School District 151, D.C., 286 F.Supp. 786; Brewer v. School Board of City of Norfolk, 4 Cir., 397 F.2d 37." 338 F.Supp. at 593.
 
 
 50
 There is, of course, other legal support for the conclusions set out above. Davis v. School District of Pontiac, 443 F.2d 573, 576 (6th Cir.), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); United States v. Board of Education, Ind. School District No. 1, 429 F.2d 1253, 1259 (10th Cir. 1970); United States v. Jefferson County Board of Education, 372 F.2d 836, 867-868 (5th Cir. 1965), aff'd in banc, 380 F.2d 385 (5th Cir. 1966), cert. denied sub nom. Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1970); Clemons v. Board of Education, 228 F.2d 853, 858 (6th Cir.), cert. denied, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956); Spangler v. Pasadena Board of Education, 311 F.Supp. 501, 522 (C.D.Cal. 1970).
 
 
 51
 Witness Charles Wells, defendant School Board's assistant superintendent in charge of the Office of Pupil Personnel Services, read into the record and testified in support of the minutes of a meeting of the Citizens Association for Better Schools. Mr. Wells was the president of the Citizens' Association at the time the meeting was conducted. His testimony includes the following:
 
 
 52
 "Q. (By Mr. Lucas) Go ahead, sir.
 
 
 53
 "A. 'November 3, 1960.
 
 
 54
 'TO: Honorable Nathan Kaufman, Chairman Committee on Equal Education Opportunity.
 
 
 55
 'We should like to begin our presentation by reviewing with you briefly the development of our organization. We feel it is significant as it represents an attempt on the part of people who make up this organization to effectively deal with the frustrations historically inherent in attempting to provide for minority group children an adequate education within the Detroit Public School System. A majority of the people of the Negro race moved into the now Center District from other school districts within the limits of the City of Detroit. Although better housing conditions were but one of the motives for such a move, of equal importance was a desire to provide their children with a more equitable and enriched educational experience.
 
 
 56
 'They were aware of the increased population within their new geographical area, and accepted the counselling of the then new administration of the Board of Education, to the effect that additional tax monies would have to be made available if educational standards within the City of Detroit were to be improved, or even maintained. Consequently, each of them made a strong personal investment in the millage compaign of Spring 1959. In this campaign, initially, their efforts did not meet the wholehearted approval of the Negro community, since from past experience, particularly involving other millage campaigns, members of the Negro community had observed that the results of the expenditures of monies obtained from additional taxes, had little effect on the facilities, the equipment, or the curriculum available to their children.
 
 
 57
 'Despite this resistance, they were aware that there would be less justification for demanding adequate educational opportunities for their children if they did not accept their responsible share for the successful passing of the millage program. As a consequence of their efforts, their respective schools voted overwhelmingly for the millage program, and they logically expected that positive results would follow their efforts.
 
 
 58
 'Their first disillusionment occurred only a few months, but yet a few weeks after the passage of the millage-they were rewarded with the creation of the present Center District. In effect this District, with a few minor exceptions, created a segregated school system. It accomplished with a few marks of the crayon on the map, the return of the Negro child from the few instances of an integrated school exposure, to the traditional predominantly uniracial school system to which he had formerly been accustomed in the City of Detroit.
 
 
 59
 'Their attempts to meet this threat to their children's educational experience through existing school organizations met with little success. Their conferences with District and City-Wide administrators including the superintendent, Dr. Samuel Brownell, resulted in only rationalizations concerning segregated housing patterns, and denials of any attempts at segregation. When it was pointed out that regardless of motivation, that segregation was the result of their boundary changes, little compromise was effected, except in one or two instances, where opposition leadership was most vocal and aggressive.
 
 
 60
 'Concurrent with boundary changes, it was alarmingly noticeable that the school population within the Center District was rapidly increasing, and that the priority building program would have little positive effect in dealing with the problem. Attempts to discuss this problem with school and district administration gave promise of only minimal relief.
 
 
 61
 'Finally, it had been earlier noted by new residents moving into what is now the Center District that prior to and during its change from a uniracial (predominatly white) to a biracial system and again to a uniracial (predominatly Negro) school system that the quality of their children's previous educational experiences did not equip them to compete on an equal basis with resident children in the same grade and classifications.
 
 
 62
 'These experiences made them aware that no one organization composed of one or several schools, could effectively coordinate the mutual concern of the many parents residing within the Center District. Thus out of the several discussions of groups of people whose primary concern was the adequate and equitable education of their children, this organization was born. It is felt that no better description of its purpose, its objective, and its reason for being can be found than in the preamble to its Constitution, which is:
 
 
 63
 'PREAMBLE: Our interest is in equal educational opportunities for all persons within the City of Detroit.
 
 
 64
 'We do not believe that such opportunities are possible within a segregated school system.
 
 
 65
 'We oppose a policy of containment of minority groups within specified boundaries, an example of which is the Center District. While the above is of utmost concern to us we are also aware that there is need for improvement and enrichment of the standards within this district in practice as well as in theory.
 
 
 66
 'We believe that once standards have become reasonably adequate, that such standards should be maintained. It should be further recognized that future population shifts brought about by urban redevelopment will adversely affect the above goals in the Center District, unless there is anticipation of the impact of this population growth upon this district.
 
 
 67
 'Since the inception of our organization we have noted the following:
 
 
 68
 'The public school system of the City of Detroit is divided into nine administrative districts, one of which is the Center District.
 
 
 69
 'Yet, every day, when the children in this city leave their homes to go forth to public schools, approximately one out of every four leaves a home in the Center District. Of the 154,969 children enrolled in public elementary schools as of September 30, 1960, 36,264 or 23.4 percent of these children leave a home in the Center District.
 
 
 70
 'There are 221 elementary school buildings in the Detroit Public School System. Of these 28 are in the Center District. This means, then, that the 23.4 percent of the total elementary school population is accommodated in 12.7 percent of the buildings.
 
 
 71
 'Fifteen percent of these children sit in classes of 40 to 44 students per class. This is in comparison to:
 
 
 72
 East .13 percent
North .05 percent
Northeast .04 percent
Northwest .08 percent
South .01 percent
Southeast .01 percent
West .05 percent
 
 
 73
 'Sixty-two and one-half percent of all the children in the city's elementary schools who sit in classes of 45 to 49 are children in the Center District. These schools in the Center District find their capacities short by 6,352 pupil stations. In other words, their capacities are overtaxed to the extent of 16 percent; and the future building program, as set forth by the superintendent's report of October 17, 1960, will make available only 11,189 additional pupil stations within the next ten-year period. However, this will be insufficient to meet the demands of the Center District. Therefore, it is apparent that a school bussing program will have to become a permanent part of the school housing program. Thus the manner in which the bussing program is administered becomes a matter of acute concern.
 
 
 74
 'Presently, children are being bussed by grades. Under this system a number of problems are created:
 
 
 75
 1) It makes necessary a reorganization of the bussing school, as well as the school into which the children are bussed.
 
 
 76
 2) They are not integrated into the school into which they are bussed, except in minor instances.
 
 
 77
 3) There is a possibility of the separation of the family unit.
 
 
 78
 4) Parents are unable to establish a good rapport with the teachers and administrators in the new school since there exists a time limit in which these children will be members of that school.
 
 
 79
 'It is recommended that a policy of bussing by geographical areas instead of by grades be instituted so as to eliminate the above problems.
 
 
 80
 'The emphasis on curricula objective are not comparable in the various school districts of the Detroit School System. There is a tendency in the Center District to stereotype the educational capacity of the children. This means that children entering the schools in this district whose background enables them to comprehend an enriched educational program, are not challenged.
 
 
 81
 'For example, one student in the Hutchins Intermediate School who desired to prepare for entrance into an Eastern college found that Latin was not offered, and only after considerable effort by members of the community, along with his family, was Latin placed back in the school curriculum. Many other instances can be cited upon request.
 
 
 82
 'Conversely, children whose initial capacity is retarded by deprived socio-economic circumstances also go unchallenged. The District Administrator has admitted that no program exists to take care of these children.
 
 
 83
 'The curriculum and counselling as they now exist, do not encourage students to achieve their maximum capacities. We feel that the responsibility for any inequities in the educational experience offered to any group of children within a given school system must be assumed by those persons charged with the overall responsibility of administering that system.
 
 
 84
 'Therefore, we recommend that strong policies be adopted by the top administration to erase inequities of the Detroit Public School System, and a policy of supervision through all levels of administration be instituted at all levels of administration to insure equal educational opportunities to all children.
 
 
 85
 'The Citizens' Association for Better Schools.'
 
 
 86
 "Q. Do you join in that statement in submission to the committee?
 
 
 87
 "A. Yes, I did."
 
 
 88
 Mr. Wells cited the example of the Center (administrative) District, where attendance boundaries were shaped in a gerrymandered fashion to conform to the racial residential pattern.
 
 
 89
 "Q. With regard to that same situation, you were expressing a problem which your committee had met in attempting to discuss this. Can you tell me how you came to be discussing this with the Board at that time?
 
 
 90
 "A. It was not with the Board of Education, I believe it was with the administration of the school system.
 
 
 91
 "Q. The administrative staff?
 
 
 92
 "A. Including the superintendent.
 
 
 93
 "Q. All right.
 
 
 94
 "A. Our initial concern about the boundaries of the center district grew out of the concern we had in 1960 about the changing of the attendance areas between the Central High School and the Mackenzie High School.
 
 
 95
 "Q. Is that the optional attendance area also set up in that?
 
 
 96
 "A. A part of that was optional. Well, let's put it that way, a part of it had been optional, the proposal was to eliminate the option. In the process of eliminating the option what it would mean would be that by and large the few black children who had been attending Mackenzie would have been pulled back into the Central area.
 
 
 97
 "Q. Mackenzie at that time was a majority white school?
 
 
 98
 "A. Predominately white.
 
 
 99
 "Q. Central by that time had become black?
 
 
 100
 "A. Predominately black.
 
 
 101
 "Q. So the cancellation of the optional area which had been there had the effect of preventing black children choosing Mackenzie, is that correct?
 
 
 102
 "A. That is right.
 
 
 103
 "Q. Were there any other schools -there is a reference made to the establishment of the center district boundaries-were there any other schools which had not previously been in certain feeder patterns that were drawn back into the center district?
 
 
 104
 "A. I am trying to remember now as I said eleven years.
 
 
 105
 "Q. I understand.
 
 
 106
 "A. If I remember correctly, the Sherrill School which also had been a part of it, that portion north of Tireman had been attending Mackenzie and they in turn, the total school then would have been returned to the Chadsey area.
 
 
 107
 "Q. What about Tappan and that area, are you familiar at all with changes that took place?
 
 
 108
 "A. Tappan was the junior high school in which Winterhalter, the elementary school in the area south of Davison just west of Ewald Circle attended. At that time the students from that area attended Tappan and all students from Tappan attended Mackenzie.
 
 
 109
 "The new change would mean that the students from Winterhalter, and I think McKerrow which is just below Winterhalter would have attended Tappan through the 9th grade, but then had been pulled back into the center district to attend Central High School.
 
 
 110
 "The other students in Tappan would have gone to Mackenzie.
 
 
 111
 "Q. The other students in Tappan, were they predominately white students?
 
 
 112
 "A. Yes. Our concern about this region really at that time was that we could draw a line which separated the black residents from the white residents and almost to the alley and that in effect was the boundary line of the center district."
 
 
 113
 There was evidence that school feeder patterns were changed so as to make particular junior high schools or senior high schools either generally white or generally black, as shown in the following testimony:
 
 
 114
 "MR. CALDWELL: Your Honor, I have copies of the Mumford High School district in 1959 which is taken from Plaintiff's Exhibit 78-A, and this makes it easier to see the schools.
 
 
 115
 "Q. Let's get back to the 1962-63 overlay.
 
 
 116
 "Prior to the 1962-63-first of all, will you point out to the Court where the Vandenberg and Vernor Schools are.
 
 
 117
 "A. This triangle to the northwest corner of this area. (indicating)
 
 
 118
 "Q. Prior to 1962-63 where did the Vernor and Vandenberg youngsters go to high school?
 
 
 119
 "A. Mumford High School.
 
 
 120
 "Q. A boundary change was made in 1962-63?
 
 
 121
 "A. That's right.
 
 
 122
 "Q. Where did those youngsters go to school in that year?
 
 
 123
 "A. Ford High School.
 
 
 124
 "Q. How long did that feeder pattern continue?
 
 
 125
 "A. Until 1966-67 when they returned to Mumford.
 
 
 126
 "Q. All right.
 
 
 127
 "MR. CALDWELL: Plaintiffs' Exhibit 128-A, your Honor, reflects that in 1960 Vandenberg and Vernor were 0 percent black. Mumford was 16.1 black, Ford was .1 percent black. With regard to Vandenberg and Vernor, there was a gradual increase in the black population until 1966 when Vandenberg was 39.5 percent black and Vernor was 39.8 percent black.
 
 
 128
 "Then in 1967 the change was made taking Vandenberg and Vernor back into Mumford. Vandenberg had become 70 percent black, Vernor had become 63.2 percent black. That year the change was made and Mumford was 78.1 percent black, Ford was 4.1 percent black.
 
 
 129
 "Q. I believe that feeder pattern continued into the current school year?
 
 
 130
 "A. That is right."Q. Those schools now feed back into Ford High School this year?
 
 
 131
 "A. That is right."
 
 
 132
 The effect of such a policy was attested to by Dr. Gordon Foster of the University of Miami, director of the Florida School Desegregation Consulting Center:
 
 
 133
 "Q. The effect, Doctor, then, of the removal of Vandenberg and Vernor from the Ford feeder pattern into the Mumford feeder pattern, what was the effect in terms of race?
 
 
 134
 "A. The effect of this move in 1967-68 of the transfer back of the two elementary schools was to increase the segregation at Mumford, to take blacks from the Ford High School and, therefore, increase the segregated pattern there, and, in my opinion, it reinforced inevitably the perception that Ford would be kept white as a matter of basic policy and that Mumford would be a racially contained isolated high school attendance area."
 
 
 135
 Similar testimony regarding the segregative effect of altering school feeder patterns was given with respect to the Jefferson and Hutchins Junior High Schools, Garfield and Spain Junior High Schools, Burton and Irving Elementary Schools, Higginbotham Elementary School, Jackson and Foch Junior High Schools, Stellwagen, Keating and Clark Elementary Schools, Cleveland and Nolan Junior High Schools, Courville Elementary School, Ford and Brooks Junior High Schools, Osborne and Pershing High Schools, Parkman Elementary School, the Ellis, Sills, Newberry and Sampson Elementary Schools, and Northwestern and Chadsey High Schools.
 
 
 136
 The District Judge made the following findings of fact pertaining to busing black children to black schools past white schools:
 
 
 137
 "The Board, in the operation of its transportation to relieve overcrowding policy, has admittedly bused black pupils past or away from closer white schools with available space to black schools. This practice has continued in several instances in recent years despite the Board's avowed policy, adopted in 1967, to utilize transportation to increase integration.
 
 
 138
 "With one exception (necessitated by the burning of a white school), defendant Board has never bused white children to predominantly black schools. The Board has not bused white pupils to black schools despite the enormous amount of space available in inner-city schools. There were 22,961 vacant seats in schools 90% or more black." 338 F.Supp. at 588.
 
 
 139
 The legal conclusion of the District Judge follows:
 
 
 140
 "8. The practice of the Board of transporting black students from overcrowded black schools to other identifiably black schools, while passing closer identifiably white schools, which could have accepted these pupils, amounted to an act of segregation by the school authorities. Spangler v. Pasadena City Bd. of Ed., D.C., 311 F.Supp. 501." 338 F.Supp. at 593.
 
 
 141
 Additional support for the District Judge's legal conclusion includes: United States v. School District 151, 286 F. Supp. 786, 798 (N.D.Ill.1967), aff'd, 404 F.2d 1125, 1131 (7th Cir. 1968), on remand, 301 F.Supp. 201, 211, 222 (N.D. Ill.1969), aff'd, 432 F.2d 1147, 1150 (7th Cir. 1970), cert. denied, 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971); United States v. Board of School Commissioners, Indianapolis, Ind., 332 F. Supp. 655, 669 (S.D.Ind.1971), aff'd 474 F.2d 81 (7th Cir. 1973).
 
 
 142
 The following testimony pertains to busing black children from overcrowded black schools past white schools with available pupil capacity to other black schools:
 
 
 143
 "Q. I am trying to anticipate, Mr. Ritchie's question. Have you noted some examples of the bussing of black children from black schools to other black schools?
 
 
 144
 "A. I have.
 
 
 145
 "Q. Could you give us a couple illustrations?
 
 
 146
 "MR. BUSHNELL: While Dr. Foster is looking through his notes, might I make the request that we made yesterday that on conclusion of his testimony we have access to the notes made?
 
 
 147
 "MR. LUCAS: At the conclusion, yes. We have no objection to that.
 
 
 148
 "A. In 1960-61, and we don't have any record for '61-62 so I am not certain as to that year, students were transported from Angell to Greenfield Park. This has already been part of our testimony, I believe, 186 students and students from Angell to Higginbotham, 118 students. In 1969-
 
 
 149
 "Q. Excuse me, Doctor, let me ask you if the Angell-Higginbotham-were there white schools available with space, from your examination of the records?
 
 
 150
 "A. Yes, there were.
 
 
 151
 "Q. Between Angell and Higginbotham?
 
 
 152
 "A. Yes, sir, I believe I testified to that before.
 
 
 153
 "Q. All right.
 
 
 154
 "A. In 1969 the Ruthruff Elementary School which was 99 percent black transported 143 children to Herman Elementary, 55 percent black.
 
 
 155
 ******
 
 
 156
 * * *
 
 
 157
 "Q. (By Mr. Lucas, continuing) Dr. Foster, would you step to the map.
 
 
 158
 "I think we were talking about the Ruthruff-Herman Schools.
 
 
 159
 "A. Yes. We were testifying at recess about transportation of blacks past white schools. In 1969 we stated that Ruthruff Elementary which is here in the southeastern portion of the Mackenzie High School zone on the large 1970-71 attendance area map, in 1969 transported 143 children to Herman Elementary School which is just below the blue area on the undermap here-Herman Elementary School (indicating). Herman in 1969 was 55.6 percent black. Ruthruff was 99.1 percent black and I think it is important to note that the access to Herman goes right past the Parkman Elementary School which at that time had 136 spaces available and according to their capacity figures-
 
 
 160
 "Q. Parkman was what percentage?
 
 
 161
 "A. Parkman I don't have the figure for '69 and '70. Parkman was 12.8 percent black."
 
 
 162
 ******
 
 
 163
 * * *
 
 
 164
 "A. Another example was the Parker Elementary School which is in the general center of the Mackenzie High School zone. Parker in 1970 was 79.4 black; 61 children were bussed from Parker again to the Herman Elementary School which at that time was 58.5 percent black and again past the Parkman Elementary which in 1970 was 12.8 percent black.
 
 
 165
 "Q. Did Parkman have capacity at that time, Doctor?
 
 
 166
 "A. Parkman in '70, according to my data, had 121 spaces.
 
 
 167
 ******
 
 
 168
 * * *
 
 
 169
 "Q. Excuse me, would you give us the A. L. Homes.
 
 
 170
 "MR. BUSHNELL: I thought the Court ruled on that?
 
 
 171
 "THE COURT: He says he is pursuing a non-cumulative matter here. If that be true he may go ahead.
 
 
 172
 "A. A. L. Homes School, children were bussed from this school over to the McGraw School which is in the south end of the Northwestern District in center city. In 1970-71 the Post Junior High School, which is located-
 
 
 173
 "MR. BUSHNELL: If the Court please, Mr. Lucas just pointed out the location of Post which the witness obviously couldn't find on the map.
 
 
 174
 "THE COURT: Well, he hasn't moved it.
 
 
 175
 "A. I noted the west section of Cooley instead of the east. The Post Junior High School and Clinton Schools, which are in the east section of the Cooley High School attendance zone transported 54 students to the Jefferson School which is now in the Murray zone and it is located in the eastern section of the Murray High School attendance area. I think it is important to note that these students who were bussed came from a considerable distance north and there were several possibilities-
 
 
 176
 "Q. Excuse me, were the Post children in a black school or white school?
 
 
 177
 "A. The Post School this year, 1970-71 was 99.3 percent black. The Clinton School from which they also came was 97 percent black.
 
 
 178
 "Q. What about Jefferson?
 
 
 179
 "A. Jefferson was 87.6 percent black. There were two or three other possibilities much closer to the Post-Clinton area. One would have been in the western portion of the Mackenzie district here (indicating).
 
 
 180
 "Q. What is the racial composition?
 
 
 181
 "A. At this time it had 35.4 percent black with a capacity of 109 stations available. Another possibility would have been the Vetal School in the Redford zone, the southern portion of the Redford High School zone, which at this time was 2 percent black with vacancies of 203 pupil stations and a third alternative could have been the Coffey School to the east of the Ford attendance area which at this time was 29 percent black with 69 pupil stations available.
 
 
 182
 "Q. Did you say to the east was part of the Ford attendance area or outside of that, Doctor?
 
 
 183
 "A. It's in the Ford attendance area.
 
 
 184
 ******
 
 
 185
 * * *
 
 
 186
 "THE COURT: Well, to save time why don't we proceed on the assumption that that was his testimony. But if it proves otherwise we will strike it.
 
 
 187
 "MR. LUCAS: Thank you, sir.
 
 
 188
 "Q. (By Mr. Lucas) Doctor, I understand that the policy of the district is that bussing to relieve overcrowding would be done in such a manner as to improve integration at the receiving school. From your examination of the current bussing examples which you have given, do you have an opinion as to whether or not that policy has or has not been followed?
 
 
 189
 "A. Well, I think from the examples I have given so far it would give an indication that integration could have been effected in a much better way if the children, instead of going to the schools would have been dropped off at other schools where the racial balance was quite different.
 
 
 190
 ******
 
 
 191
 * * *
 
 
 192
 "Q. Are there any white schools from your examination of data, Doctor Foster, between Angell and Higginbotham which had capacity at that time?
 
 
 193
 "A. Yes, there were several which were a good deal closer to Angell than Higginbotham. The effect of this sort of zoning pattern was to provide segregated student ratios at all three of the elementary schools, and in terms of things that could be done or could have been done at that particular time to correct the segregated situation, it is my opinion that, first of all, the students being bussed from Angell could have been dropped off at any number of places on the way to Higginbotham, schools which had the space and had a better racial composition for this sort of input. This having been done, zone lines could have been redrawn at these three schools to have approached a racial balance situation which, in my opinion, would have helped to stabilize the situation at that time. This would have also assisted in the overcrowding at Pasteur and a couple of classrooms extra at Higginbotham.
 
 
 194
 "Q. Do you have an opinion, Doctor as to the perception created by the maintenance of the Higginbotham School under those circumstances, including the transportation of black students from Angell into it?
 
 
 195
 "A. Well, it is obvious that if you transport black children past white schools to an all black school that the community is going to perceive this as a segregated intent, a segregated action. If you have a boundary situation which isolates and enforces black students to a particular area when the boundary lines could be changed to effectuate a better pattern racially, then it seems to me that community perception would also be that the school is not doing what it could in terms of integration and equal opportunity.
 
 
 196
 "Q. Doctor, from your examination of the data in 1960 are there any administrative reasons, any administrative problems which would indicate to you a reason why this boundary was maintained rather than drawn in some other fashion?
 
 
 197
 "A. In terms of school capacity there are none, no."
 
 
 198
 Defendant's witness (Mr. Henrickson) admitted instances of busing black students past closer white schools to black schools:
 
 
 199
 "Q. We find on the under and over capacity map in the Higginbotham area that there were three schools surrounding Higginbotham. Vernor, which is listed as being 121 over capacity; MacDowell, 103, is it? Pasteur, 90. At the same time we find that Higginbotham was 489 under capacity. Is that what the exhibit shows, sir?
 
 
 200
 "A. Yes.
 
 
 201
 "Q. We also know, do we not, that Pasteur, MacDowell and Vernor were white schools?
 
 
 202
 "A. Both Pasteur and MacDowell at that time, as I recall, had some beginning of black students as a result of the growth of the settlement of the Higginbotham area.
 
 
 203
 "Q. They were predominantly white schools at that time?
 
 
 204
 "A. Yes.
 
 
 205
 "Q. Higginbotham was all or virtually all black?
 
 
 206
 "A. Yes.
 
 
 207
 "Q. Indeed, it had been the same in 1950, had it not?
 
 
 208
 "A. Yes.
 
 
 209
 "Q. At the same time that we are talking about you were transporting youngsters from Angell to Higginbotham, is that correct?
 
 
 210
 "A. Yes.
 
 
 211
 "Q. Those were black kids being transported from Angell to Higginbotham?
 
 
 212
 "A. Yes.
 
 
 213
 "Q. We also know on that exhibit that they were transported past such schools as Fitzgerald and Clinton which had more than enough capacity to handle them?
 
 
 214
 "A. We have made no denial of that."
 
 
 215
 For some years it was a Board of Education policy to transport classrooms of black children intact to white schools where they were educated in segregated classes.
 
 
 216
 Testimony as to the intact busing practice follows:
 
 
 217
 "Q. (By Mr. Lucas, continuing) Will you go into the Detroit system, Doctor, on transportation.
 
 
 218
 "A. Answering it generally, counsellor, my answer would be that the intact bussing is the practice of transporting classrooms of children intact from one school to another and leaving them intact when they are educated at the receiving school.
 
 
 219
 "Q. Doctor, when such transportation occurs from a school which is 90 percent or more black to a school which is predominantly a white school, what effect, if any, does this have in terms of racial segregation on those children?
 
 
 220
 "A. This would lead to what we call classroom segregation or segregation within a particular school. It could be sometimes resegregation, but essentially it is a segregated situation within a school which could be segregated or not segregated generally.
 
 
 221
 "Q. Doctor, in your experience with school segregation and school desegregation plans, is this a technique which you have had to deal with in the past?
 
 
 222
 "A. On occasion, yes, sir."Q. Doctor, did you examine data or relevant information with respect to the transportation practices in the Detroit school system in connection with this type of bussing, intact bussing?
 
 
 223
 "A. Yes, sir.
 
 
 224
 "Q. What did your examination reveal, Doctor?
 
 
 225
 "A. It is my understanding from the data that there was intact bussing generally in the late '50's, as I said, and early '60's.
 
 
 226
 "Q. How did that intact transportation operate, Doctor?
 
 
 227
 "A. It involved transporting classrooms in whole from one school to another receiving school and at the receiving school the classrooms were kept intact for instructional purposes.
 
 
 228
 "Q. Was this policy changed at any time, Doctor, as far as you know?
 
 
 229
 "A. It is my understanding it was changed in the middle '60's but I don't remember the exact date.
 
 
 230
 "Q. What would the change be, Doctor? What type of bussing would result in terms of relieving overcrowding?
 
 
 231
 "A. You simply gather children up on a geographical basis and transport them and assign them at random to whatever grade they are in the receiving school rather than keeping them in an intact classroom."
 
 
 232
 Segregating children by race within schools has been held repeatedly to be unconstitutional. Jackson v. Marvell School District No. 22, 425 F.2d 211, 212 (8th Cir. 1970); Johnson v. Jackson Parish School Board, 423 F.2d 1055 (5th Cir. 1970).
 
 
 233
 The record indicates that in at least one instance Detroit served a suburban school district by contracting with it to educate its black high school students in a Detroit high school which was overwhelmingly black by transporting them away from nearby suburban white high schools and past Detroit high schools which were predominantly white.
 
 
 234
 The District Judge found on this score that for years black children in the Carver School District were assigned to black schools in the inner city because no white suburban district (or white school in the city) would take the children.
 
 
 235
 This finding is supported by the testimony of Detroit School Superintendent Drachler, which follows:
 
 
 236
 "Q. When was the Carver District in existence as a separate entity?
 
 
 237
 "A. The Carver District? The Carver is not in Detroit.
 
 
 238
 "Q. Is it a separate school district whose students attended some Detroit high schools, in particular Northern?
 
 
 239
 "A. Oh, I see what you're referring to. I am told that back in '57, '58, at that time I was not in Central Office, there were some students from Carver District who did not have a place for adequate high school facilities. An arrangement was made with Detroit for the Carver students to come in on buses and go to Northern High School. Now, the nearest school to Carver was Mumford at the time. And they did go past Mumford towards Northern.
 
 
 240
 "Q. Is Carver a black district?
 
 
 241
 "A. Yes, black and very poor.
 
 
 242
 "Q. Has Carver District subsequently merged with Detroit?
 
 
 243
 "A. Oak Park.
 
 
 244
 "Q. With Oak Park?
 
 
 245
 "A. That's right.
 
 
 246
 "Q. And at that time the transportation was terminated?
 
 
 247
 "A. That's right. By the way, as a result of those youngsters coming, there was a rumor spread that Detroit children were being bussed, say, from the Higginbotham, which is north- Higginbotham area which is north of Mumford High School area but in Detroit, that they were being bussed to Northern, too, because they were black students, people saw black students from the Eight Mile area coming down. But to the best of my knowledge these were outside students.
 
 
 248
 "Q. There were black children being bussed to Higginbotham weren't they?
 
 
 249
 "A. There were black children being bussed to Higginbotham.
 
 
 250
 "Q. From Angell?
 
 
 251
 "A. From Angell past some white schools. And when the issue was brought to Doctor Brownell's attention by me in about '59 or '60-there were a series of instances like that. There was the Angell, there was from the military fort in the southwest, they were bussing their own children up to the Noble, and Doctor Brownell, as soon as it was brought to his attention, abolished that as well as the optional areas.
 
 
 252
 "Q. Was this so-called intact bussing, that is a class being brought as a unit?
 
 
 253
 "A. Generally speaking, yes. That policy of changing to geographic bussing occurred about '62-'63 as a result of the Equal Education Opportunities Committee.
 
 
 254
 "Q. Was all of the bussing done in the City of Detroit of an intact nature until the Equal Opportunities study?
 
 
 255
 "A. To the best of my knowledge it was. I know when my children were being bussed, they were bussed intact."
 
 
 256
 (2) Optional Areas.
 
 
 257
 The record demonstrates that in many instances when neighborhoods in Detroit began to experience some immigration of black families, it was Board of Education policy to create optional attendance zones, thereby allowing white students to change schools to all white or predominately white schools, generally located farther toward the city limits. For many years the record indicates this practice to have been pervasive. It continued in at least one instance up to the 1970-71 school year.
 
 
 258
 As to optional attendance zones, the District Judge found:
 
 
 259
 "During the decade beginning in 1950 the Board created and maintained optional attendance zones in neighborhoods undergoing racial transition and between high school attendance areas of opposite predominant racial compositions. In 1959 there were eight basic optional attendance areas affecting 21 schools. Optional attendance areas provided pupils living within certain elementary areas a choice of attendance at one of two high schools. In addition there was at least one optional area either created or existing in 1960 between two junior high schools of opposite predominant racial components. All of the high school optional areas, except two, were in neighborhoods undergoing racial transition (from white to black) during the 1950s. The two exceptions were: (1) the option between Southwestern (61.6% black in 1960) and Western (15.3% black); (2) the option between Denby (0% black) and Southeastern (30.9% black). With the exception of the Denby-Southeastern option (just noted) all of the options were between high schools of opposite predominant racial compositions. The Southwestern-Western and Denby-Southeastern optional areas are all white on the 1950, 1960 and 1970 census maps. Both Southwestern and Southeastern, however, had substantial white pupil populations, and the option allowed whites to escape integration. The natural, probable, foreseeable and actual effect of these optional zones was to allow white youngsters to escape identifiably 'black' schools. There had also been an optional zone (eliminated between 1956 and 1959) created in 'an attempt . . . to separate Jews and Gentiles within the system,' the effect of which was that Jewish youngsters went to Mumford High School and Gentile youngsters went to Cooley. Although many of these optional areas had served their purpose by 1960 due to the fact that most of the areas had become predominantly black, one optional area (Southwestern-Western affecting Wilson Junior High graduates) continued until the present school year (and will continue to effect 11th and 12th grade white youngsters who elected to escape from predominantly black Southwestern to predominantly white Western High School). Mr. Henrickson, the Board's general fact witness, who was employed in 1959 to, inter alia, eliminate optional areas, noted in 1967 that: 'In operation Western appears to be still the school to which white students escape from predominantly Negro surrounding schools.' The effect of eliminating this optional area (which affected only 10th graders for the 1970-71 school year) was to decrease Southwestern from 86.7% black in 1969 to 74.3% black in 1970." 338 F. Supp. at 587-588.
 
 
 260
 From these facts the District Judge arrived at the following legal conclusion:
 
 
 261
 "7. The Board's policy of selective optional attendance zones, to the extent that it facilitated the separation of pupils on the basis of race, was in violation of the Fourteenth Amendment. Hobson v. Hansen, D.C., 269 F.Supp. 401, aff'd sub nom., Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F. 2d 175. [(1969)]." 338 F.Supp. at 593.
 
 
 262
 Additional support for the District Judge's legal conclusion includes: United States v. Texas Education Agency, 467 F.2d 848 (5th Cir. 1972); Northcross v. Board of Education of Memphis, 333 F.2d 661, 665-666 (6th Cir. 1964) (different but analogous situation); United States v. Board of School Commissioners of Indianapolis, 332 F.Supp. 655, 668 (S.D.Ind.1971) aff'd 474 F.2d 81 (7th Cir. 1973); Spangler v. Pasadena City Board of Education, 311 F.Supp. 501, 502 (C.D.Cal.1970).
 
 
 263
 The effect of use of optional zones was described in Dr. Foster's testimony:
 
 
 264
 "The first method or technique I might cite that is used to maintain segregation would be the use of optional zones.
 
 
 265
 "Would it be possible for me to step to the board to illustrate?
 
 
 266
 "Q. Please do.
 
 
 267
 (The witness proceeded to the blackboard.)
 
 
 268
 "A. Optional zones are sometimes also referred to as dual zones or dual overlapping zones. I think it will be easier for me to illustrate this briefly.
 
 
 269
 (The witness drew a sketch on the board.)
 
 
 270
 "A. If you have, let's say, two high school districts, District X and District Y, frequently when you set up an optional zone you carve the zone out of one district, occasionally two, but assume we carve it out of District Y and the children in this optional zone are then permitted to go to either high school X or high school Y, this becomes in a sense an overlapping zone because if we refer to the boundaries of school District X at this point it not only includes the previous boundary but also takes in the optional zone.
 
 
 271
 "District Y in turn would include its previous boundaries, also including the optional zone. I think this may explain the origin of the connotation of the word 'overlapping'.
 
 
 272
 "Essentially optional zones are set up for two or three reasons, one is to allow white students or black students the option of attending one of the two attendance areas which make up the boundaries of the zone and another is for, occasionally for religious purposes to provide alternatives for persons of different religions. Sometimes these are set up for socio-economic reasons and I have on occasion seen them set up by boards of superintendents as political gimicks in order to help pass a bond issue or one thing or another or a school board or superintendent will set up temporary optional zones as a favor to certain constitutents in return for assistance in helping the school board with one thing or another.
 
 
 273
 "I think in the framework in which we operate they are used primarily for maintaining segregated patterns.
 
 
 274
 ******
 
 
 275
 * * *
 
 
 276
 "Q. Dr. Foster, have you made a study and analysis of optional zones in the Detroit school system?
 
 
 277
 "A. Yes, I have."
 
 
 278
 Dr. Foster's analysis of the purpose and effect of each optional zone in existence in the Detroit School District is exemplified in his testimony on the Mackenzie-Central option.
 
 
 279
 "Q. Doctor Foster, do you have an opinion as to the administrative use of the optional attendance zone in 1960 between and prior to that in Mackenzie-Central area?
 
 
 280
 "A. Yes. I think it was used primarily-you mean as to the purpose of it?
 
 
 281
 "Q. Well, as to whether or not it had any administrative value that you know of, Doctor, aside from race?
 
 
 282
 "A. In terms of assignment I can see no advantage to it.
 
 
 283
 ******
 
 
 284
 * * *
 
 
 285
 "Q. Do you have an opinion as to its use in terms of segregation or desegration, Doctor Foster?
 
 
 286
 "A. In my opinion it was used as an optional zone to allow whites during the period it was in existence in the '50's and also until such time as it was done away with in 1962 to be assigned to predominantly white Mackenzie High School.
 
 
 287
 "Q. Doctor Foster, from your examination of the 1950 census and in turn the 1960 census exhibits, do you have an opinion as to the effect of such an optional zone on the community residence pattern in the community?
 
 
 288
 ******
 
 
 289
 * * *
 
 
 290
 "A. Community people and residents in a situation such as this generally have a perception that there is something wrong with their school, that the whites need an optional zone to get out into a less black situation and, therefore, this increases their perception of racial isolation and, in fact, physical containment.
 
 
 291
 "Q. Does this have an effect, Doctor, in terms of the residence pattern? I believe you testified in 1950 the optional area was entirely white or zero to 4.9 per cent white.
 
 
 292
 ******
 
 
 293
 * * *
 
 
 294
 "A. In my opinion this tends to increase the instability of the community because they generally feel this is an ad hoc temporary interim situation and it increases white flight in this sort of situation.
 
 
 295
 ******
 
 
 296
 * * *
 
 
 297
 "Q. Doctor Foster, does the use of these techniques in some areas have an effect in terms of the perception of the community of schools besides the actual two schools to which the option was involved?
 
 
 298
 ******
 
 
 299
 * * *
 
 
 300
 "A. Thank you. Yes, I think the perception is not only of rank and file community residents, but people of considerable influence in the community, along with School Board administration people, School Board members, School Board officials. In many cases they have substantiated this perception that I have recounted; that the optional zones did lead to greater pupil segregation and a feeling of frustration that the school authorities were not doing what was called for in terms of desegregation, and it had a generally debilitating effect on the image of the schools as far as all of these groups were concerned."
 
 
 301
 Mr. Henrickson, defendant School Board's principal witness and divisional director of planning and building studies in the School Housing Division, did not deny the discriminatory effect of at least some of these optional zones."Q. In 1959 optional areas frustrated integration, did they not?
 
 
 302
 "MR. BUSHNELL: Objection to the form of the question.
 
 
 303
 "THE COURT: He may answer.
 
 
 304
 "A. Some of these areas in 1959 had no effect whatever with movement of black or white students. They were either all black or all white. Some of them such as the Western-Southwestern area can be said to have frustrated integration and continued over the decade."
 
 
 305
 (3) Building Construction.
 
 
 306
 The District Judge found and the record contains evidence that the Detroit Board of Education practices in school construction generally tended to have segregative effect; the great majority of schools were built in either overwhelmingly all black or all white neighborhoods so that the new schools opened as one race schools.
 
 
 307
 The District Judge's school construction findings were as follows:
 
 
 308
 "In 1966 the defendant State Board of Education and Michigan Civil Rights Commission issued a Joint Policy Statement on Equality of Educational Opportunity, requiring that
 
 
 309
 'Local school boards must consider the factor of racial balance along with other educational considerations in making decisions about selection of new school sites, expansion of present facilities . . . . Each of these situations presents an opportunity for integration.'
 
 
 310
 Defendant State Board's 'School Plant Planning Handbook' requires that
 
 
 311
 'Care in site locations must be taken if a serious transportation problem exists or if housing patterns in an area would result in a school largely segregated on racial, ethnic, or socio-economic lines.'
 
 
 312
 The defendant City Board has paid little heed to these statements and guidelines. The State defendants have similarly failed to take any action to effectuate these policies. Exhibit NN reflects construction (new or additional) at 14 schools which opened for use in 1970-71; of these 14 schools, 11 opened over 90% black and one opened less than 10% black. School construction costing $9,222,000 is opening at Northwestern High School which is 99.9% black, and new construction opens at Brooks Junior High, which is 1.5% black, at a cost of $2,500,000. The construction at Brooks Junior High plays a dual segregatory role: not only is the construction segregated, it will result in a feeder pattern change which will remove the last majority white school from the already almost all-black Mackenzie High School attendance area.
 
 
 313
 "Since 1959 the Board has constructed at least 13 small primary schools with capacities of from 300 to 400 pupils. This practice negates opportunities to integrate, 'contains' the black population and perpetuates and compounds school segregation." 338 F.Supp. at 588-589.
 
 
 314
 Other cases in which such findings have been held to constitute a de jure act of segregation include: Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 21, 91 S.Ct. 1267, 28 L. Ed.2d 554 (1971); Cisneros v. Corpus Christi Independent School Dist., 467 F. 2d 142 (5th Cir. 1972), pet. for cert. filed, 41 U.S.L.W. 3225 (Oct. 31, 1972); Kelly v. Guinn, 456 F.2d 100 (9th Cir. 1972), petition for cert. filed, 41 U.S.L. W. 3114 (U.S. Aug. 28, 1972); Davis v. School District of Pontiac, 443 F.2d 573, 576 (6th Cir.), cert. denied 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); Sloan v. Tenth School District, 433 F.2d 587, 590 (6th Cir. 1970); United States v. Board of Education of Tulsa, 429 F. 2d 1253, 1259 (10th Cir. 1970); Brewer v. School Board of Norfolk, 397 F.2d 37, 42 (4th Cir. 1968); United States v. Board of Public Instruction, 395 F.2d 66, 69 (5th Cir. 1968); Kelley v. Altheimer, Arkansas Public School Dist. No. 22, 378 F.2d 483, 496-497 (8th Cir. 1967); Johnson v. San Francisco Unified School District, 339 F.Supp. 1315, 1326, 1341 (N.D.Cal.1971); United States v. Board of School Commissioners of Indianapolis, 332 F.Supp. 655 (S.D. Ind.1971) aff'd 474 F.2d 81 (7th Cir. 1973); Spangler v. Pasadena City Board of Education, 311 F.Supp. 501, 522 (C.D.Cal.1970); United States v. School District 151, 286 F.Supp. 786, 798 (N.D.Ill.), aff'd, 404 F.2d 1125 (7th Cir. 1968); Lee v. Macon County Board of Education, 267 F.Supp. 458, 472 (M. D.Ala.), aff'd per curiam sub nom., Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967).
 
 
 315
 Record evidence pertaining to Detroit Board of Education building construction practices and their results include:
 
 
 316
 "Q. Doctor Foster, I show you a document in evidence, Plaintiff's Exhibit 70. I direct your attention to page 15 of the exhibit. The exhibit is School Planning Handbook, Bulletin 412, revised, January, 1970, Michigan Department of Education. Directing your attention to Chapter 2, the School Site, and the last full paragraph in the lefthand column on page 15, Doctor, would you read that paragraph?
 
 
 317
 "A. 'Care in site location must be taken if a serious transportation problem exists or if housing patterns in an area would result in a school largely segregated on racial, ethnic or socio-economic lines.'
 
 
 318
 "Q. Doctor, would you step down to the map, please? Do you have a copy, Doctor, of Plaintiff's Exhibit 79?
 
 
 319
 "A. Yes, I do.
 
 
 320
 "Q. Doctor, would you examine Plaintiff's Exhibit 153, which shows new school construction, 1960 to 1970? Perhaps you had better step back here. Doctor, the black squares on here represent schools opening 80 to 100 per cent black in pupil enrollment. Would you direct your attention to the Drew Junior High School on the map and examine the exhibit and tell me when Drew was opened?
 
 
 321
 "A. According to the exhibit, the Drew Junior High School was opened in 1970.
 
 
 322
 "Q. And what was it opened as in terms of its enrollment, Doctor?
 
 
 323
 "A. 1,587 students.
 
 
 324
 "Q. And its percent black?
 
 
 325
 "A. 95 per cent black.
 
 
 326
 "Q. And the Eileen Primary School, Doctor, can you locate it on the map?
 
 
 327
 "A. The Eileen Primary is in the Cooley High School zone, I believe.
 
 
 328
 "Q. And when did it open, Doctor?
 
 
 329
 "A. 1970.
 
 
 330
 "Q. And what was its enrollment and its pupil population in terms of black?
 
 
 331
 "A. 333 students. The per cent black was 99.1.
 
 
 332
 "Q. Would you examine the map and locate the E. M. Turner Primary?
 
 
 333
 "A. Yes.
 
 
 334
 "Q. What year was that opened, Doctor?
 
 
 335
 "A. The Turner Primary was opened in 1969.
 
 
 336
 "Q. And its enrollment of pupil population?
 
 
 337
 "A. 362 pupils, 97.5 percent black.
 
 
 338
 "Q. Can you find the Stewart School on there, Doctor?
 
 
 339
 "A. The Stewart School is in the same general area as Turner, a little to the south.
 
 
 340
 "Q. What year was it opened?
 
 
 341
 "A. 1970.
 
 
 342
 "Q. Its population and percent black?
 
 
 343
 "A. 766 enrollment, 98.8 percent black.
 
 
 344
 "Q. Marxhausen Primary, Doctor, can you locate that on the map?
 
 
 345
 "A. Marxhausen is in the Finney zone.
 
 
 346
 "Q. Is that near or far away from the A. L. Holmes School, Doctor?
 
 
 347
 "A. As I remember, rather close to the Holmes School.
 
 
 348
 "Q. Can you locate the Holmes School with reference to that?
 
 
 349
 "A. The Holmes School is the next one to the northwest.
 
 
 350
 "Q. And what was its pupil population when it opened?
 
 
 351
 "A. Marxhausen was opened in 1970 with a pupil population of 302, 92.4 percent black.
 
 
 352
 "Q. Would you locate Mack Primary, Doctor?
 
 
 353
 "A. Mack Primary is also in the Finney zone.
 
 
 354
 "Q. And when did it open?
 
 
 355
 "A. Mack opened in 1970 with an enrollment of 173, 98.8 percent black.
 
 
 356
 "Q. Could you locate the Angell Primary area, Doctor?
 
 
 357
 "A. The Angell area is in the Northwestern attendance zone.
 
 
 358
 "Q. And what was its enrollment and percent black?
 
 
 359
 "A. Angell was 1,282 students when it opened in 1970. The percent black was 99.9.
 
 
 360
 "Q. Is there an asterisk by that particular school, Doctor?
 
 
 361
 "A. On the exhibit?
 
 
 362
 "Q. Yes.
 
 
 363
 "A. Yes, there is.
 
 
 364
 "Q. Would you refer to the cover and tell us what that asterisk indicates?
 
 
 365
 "A. It says, 'The racial count data included in existing school with the same name.'
 
 
 366
 "Q. Can you locate the Stark School, Doctor?
 
 
 367
 "A. The Stark School is in the Southeastern zone.
 
 
 368
 "Q. And what was its enrollment?
 
 
 369
 "A. The enrollment was 822 when it opened in 1969.
 
 
 370
 "Q. And the percent black?
 
 
 371
 "A. 98.4 percent black.
 
 
 372
 "Q. Can you locate the new King Senior High School, Doctor?
 
 
 373
 "A. The new King Senior High School?
 
 
 374
 "Q. Yes.
 
 
 375
 "A. Here.
 
 
 376
 "Q. When did it open?
 
 
 377
 "A. It opened in 1968.
 
 
 378
 "Q. What was its enrollment?
 
 
 379
 "A. 1,897 pupils.
 
 
 380
 "Q. And its percent black?
 
 
 381
 "A. 98.8 percent black.
 
 
 382
 "Q. Can you locate the Field Annex, Doctor?
 
 
 383
 "A. Just to the northeast of King, the Field Annex.
 
 
 384
 "Q. And what was its enrollment?
 
 
 385
 "A. 461.
 
 
 386
 "Q. Its per cent black?
 
 
 387
 "A. 90.5 per cent black.
 
 
 388
 "Q. Can you locate the Glazer School, Doctor Foster?
 
 
 389
 "A. The Glazer School is in the Central zone.
 
 
 390
 "Q. And when did it open?
 
 
 391
 "A. In 1967.
 
 
 392
 "Q. And what was its enrollment, Doctor?
 
 
 393
 "A. 850 students.
 
 
 394
 "Q. What was its per cent black?
 
 
 395
 "A. 100 per cent black."
 
 
 396
 Similar testimony was given with respect to the Stevenson, Cortez, Beaubien, Sander, St. Clair Annex, Murray, Kettering, Krolik, Joy, Tendler, Belleville, McGraw, Knudsen, Keidan, Jamieson, Butzel, Woodward, Tendler and Norvell Schools. White schools built to accommodate white residential areas included Fox, Lessenger, Murphy, Taft, Fleming, Earhart, Reeves, Brooks and McKenny Annex.
 
 
 397
 "Q. Thank you, Doctor.
 
 
 398
 "Doctor Foster, from your examination of the pattern of construction in this school system, 1960 to 1970, do you have an opinion as to the effect of that pattern of construction on segregation in the Detroit School System?
 
 
 399
 "A. My opinion is that construction practices were followed in such a way as to increase segregation. I say this because of the large number of schools that were opened that were either all black or all white or with a disproportionate number of one race or the other upon opening.
 
 
 400
 ******
 
 
 401
 * * *
 
 
 402
 "Q. (By Mr. Lucas) Does the location of a school in a particular place have a long term effect on a school system?
 
 
 403
 "A. In terms of the nature of the pupils assigned to the school, do you mean?
 
 
 404
 "Q. Yes, sir.
 
 
 405
 "A. Yes, it does.
 
 
 406
 "Q. Are there alternatives in schoolhouse construction which can or should be considered by a school district in terms of affecting the racial composition of student bodies?
 
 
 407
 "A. In terms of site selection there are, yes.
 
 
 408
 "Q. What are some of the alternatives which can or should be utilized, in your opinion, Doctor?
 
 
 409
 "A. It is customary in this day and age to consider the problem of integration or segregation very carefully in selecting sites for school buildings and, well, this was pointed out, I believe, in the bit I read from the Michigan State Department.
 
 
 410
 "Q. What effect in terms of perception of the community does it have when a school is opened with an overwhelming enrollment of one race or the other?
 
 
 411
 "A. Generally the community perceives, in my opinion, that the school has been thought of as being, going to be an all white school or all black school and in either case generally that it is racially isolated."
 
 
 412
 (B) The constitutional violations found to have been committed by the State of Michigan.
 
 
 413
 (1) School districts in the State of Michigan are instrumentalities of the State and subordinate to its State Board of Education and legislature. (See Sec. V(A), pp. 245-249, infra.) Hence, the segregative actions and inactions of the Detroit Board of Education previously outlined are the actions of an agency of the State of Michigan.
 
 
 414
 (2) In 1970 the Detroit School Board undertook implementation of its April 7 desegregation plan applicable to its high schools. On meeting considerable resistance thereto, it nonetheless proceeded. At that point the State Legislature intervened by Act 48 of the Public Acts of 1970 specifically overruling the Detroit Board of Education's desegregation plan. While this statute has since been invalidated by judgment of this court, 433 F.2d 897, its contribution to preventing desegregation and to continuing and increasing segregation of the Detroit school system cannot be overlooked.
 
 
 415
 (3) Under Michigan law, M.S.A. Sec. 15.1961, M.C.L.A. 388.851, school building construction plans must be approved by the State Board of Education. Prior to 1962 the State Board also had specific statutory authority to supervise school site selection. The proofs concerning the effect of Detroit's school construction program are therefore largely applicable to show State responsibility for the segregative results.
 
 
 416
 (4) During the critical years covered by this record the School District of Detroit was denied any allocation of State funds for pupil transportation, although such funds were made generally available for students who lived over a mile and a half from their assigned schools in rural Michigan.
 
 
 417
 (5) Finally, the cross-district transportation of black high school students from the Carver School, located in Ferndale school district, to a black high school in Detroit could not have taken place without the approval, tacit or express, of the State Board of Education. (See supra pp. 231-232
 
 
 418
 The District Judge's findings pertaining to constitutional violations by the State of Michigan are as follows:
 
 
 419
 "The State and its agencies, in addition to their general responsibility for and supervision of public education, have acted directly to control and maintain the pattern of segregation in the Detroit schools. The State refused, until this session of the legislature, to provide authorization of funds for the transportation of pupils within Detroit regardless of their poverty or distance from the school to which they were assigned, while providing in many neighboring, mostly white, suburban districts the full range of state supported transportation. This and other financial limitations, such as those on bonding and the working of the state aid formula whereby suburban districts were able to make far larger per pupil expenditures despite less tax effort, have created and perpetuated systematic educational inequalities.
 
 
 420
 "The State, exercising what Michigan courts have held to be is 'plenary power' which includes power 'to use a statutory scheme, to create, alter, reorganize or even dissolve a school district, despite any desire of the school district, its board, or the inhabitants thereof,' acted to reorganize the school district of the City of Detroit.
 
 
 421
 "The State acted through Act 48 to impede, delay and minimize racial integration in Detroit schools. The first sentence of Sec. 12 of the Act was directly related to the April 7, 1970 desegregation plan. The remainder of the section sought to prescribe for each school in the eight districts criterion of 'free choice' open enrollment) and 'neighborhood schools' ('nearest school priority acceptance'), which had as their purpose and effect the maintenance of segregation.
 
 
 422
 "In view of our findings of fact already noted we think it unnecessary to parse in detail the activities of the local board and the state authorities in the area of school construction and the furnishing of school facilities. It is our conclusion that these activities were in keeping, generally, with the discriminatory practices which advanced or perpetuated racial segregation in these schools." 338 F.Supp. at 589.
 
 
 423
 The District Judge arrived at the following legal conclusions:
 
 
 424
 "11. Under the Constitution of the United States and the constitution and laws of the State of Michigan, the responsibility for providing educational opportunity to all children on constitutional terms is ultimately that of the state. Turner v. Warren County Board of Education, D.C., 313 F.Supp. 380; Art. VIII, Secs. 1 and 2, Mich. Constitution; Daszkiewicz v. Detroit Bd. of Ed. of City of Detroit, 301 Mich. 212, 3 N.W.2d 71.
 
 
 425
 "12. That a state's form of government may delegate the power of daily administration of public schools to officials with less than state-wide jurisdiction does not dispel the obligation of those who have broader control to use the authority they have consistently with the constitution. In such instances the constitutional obligation toward the individual school children is a shared one. Bradley v. Sch. Bd. of City of Richmond, D.C., 51 F.R.D. 139, 143.
 
 
 426
 "13. Leadership and general supervision over all public education is vested in the State Board of Education. Art. VIII, Sec. 3, Mich. Constitution of 1963. The duties of the State Board and superintendent include, but are not limited to, specifying the number of hours necessary to constitute a school day; approval until 1962 of school sites; approval of school construction plans; accreditation of schools; approval of loans based on state aid funds; review of suspensions and expulsions of individual students for misconduct [Op.Atty.Gen., July 7, 1970, No. 4705]; authority over transportation routes and disbursement of transportation funds; teacher certification and the like. M. S.A. 15.1023(1), M.C.L.A. Sec. 388.1001. State law provides review procedures from actions of local or intermediate districts (see M.S.A. 15.3442, M.C.L. A. Sec. 340.442), with authority in the State Board to ratify, reject, amend or modify the actions of these inferior state agencies. See M.S.A. 15.3467; 15.1919(61); 15.1919(68(b)); 15.2299 (1); 15.1961; 15.3402, M.C.L.A. Secs. 340.467, 388.621, 388.628(a), 388.681, 388.851, 340.402; Bridgehampton School District No. 2 Fractional of Carsonville, Mich. v. Supt. of Public Instruction, 323 Mich. 615, 36 N.W.2d 166. In general, the state superintendent is given the duty '[t]o do all things necessary to promote the welfare of the public schools and public educational instructions and provide proper educational facilities for the youth of the state.' M.S.A. 15.3252, M.C.L.A. Sec. 340.252. See also M.S.A. 15.2299(57), M.C.L.A. Sec. 388.717, providing in certain instances for reorganization of school districts.
 
 
 427
 "14. State officials, including all of the defendants, are charged under the Michigan constitution with the duty of providing pupils an education without discrimination with respect to race. Art. VIII, Sec. 2, Mich. Constitution of 1963. Art. I, Sec. 2, of the constitution provides:
 
 
 428
 'No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation."' 338 F.Supp. at 593-594.
 
 
 429
 Some of the evidence in this record supporting the District Judge's findings of State acts which discriminatorily affected the Detroit Board of Education and contributed to pupil segregation follows. The State statutory scheme of support of transportation for school children directly discriminated against Detroit. Dr. John W. Porter, the State Superintendent of Public Instruction in Michigan, testified as to the State transportation aid formula:
 
 
 430
 "Q. (By Mr. Lucas) Dr. Porter, does the State pay the cost of pupil transportation in the State of Michigan?
 
 
 431
 "A. The State pays roughly 75 percent of the cost. Last year the appropriation was $29 million.
 
 
 432
 "Q. Do you know what percent of the school children in the State of Michigan are transported to the school at public expense?
 
 
 433
 "A. Yes, I do. 40 percent of all students in Michigan are transported. That equates out to about 833,000 students last year.
 
 
 434
 "Q. Dr. Porter, is there some formula in terms of distance which makes a child eligible for transportation that would be aided by the state?
 
 
 435
 "A. Yes. It is a very complicated formula that 197 computations, and we are in the process right now of reducing this-
 
 
 436
 "Q. (Interposing) You mean the financial formula is complicated. But, in terms of distance from his home to the school-
 
 
 437
 "A. A mile and a half outside the city limits. Until this year the legislature amended the Act based upon the recommendations of the State Board of Education to allow for incity transportation which we had never had before. The legislature did not appropriate funds for that. So, now the funds that are now used are basically for rural areas and suburban areas where the students live a mile and a half from the school.
 
 
 438
 "Q. When you say 'city,' is there some limitation? For instance, would Grosse Pointe, Harper Woods, areas like that that surround the City of Detroit, are they eligible for transportation?
 
 
 439
 "A. In the in-city. But, if the students come across the city boundary lines they live more than a mile and a half, which is quite prevalent throughout the state, then they are eligible for the funds.
 
 
 440
 "Q. Well, I think my question may have been confusing. Is there some type of city-is it just any place incorporated as a city that is differentiated from the rural areas, or certain cities eligible for this state aid at the present time and receive the funds-
 
 
 441
 "THE COURT: I think what Mr. Lucas is trying to get at is whether under the old practice whether any city has ceased state aid for transportation within the city.
 
 
 442
 "A. Yes, we have a number of instances where the city would be receiving aid for transportation, because the law says that if the bus in order to get the students to the school crosses outside of the city boundary, the city is then eligible for aid, and we, and we have a number of instances where that exists.
 
 
 443
 "THE COURT: In other words, where the student originates his ride outside the city limits transportation is assisted?
 
 
 444
 "A. That's right, or where the student lives in the city but the bus has to go outside of the city and come back he is also eligible. This, however, does not negate local city officials, school board officials from providing transportation. There is no prohibition against that.
 
 
 445
 "Q. (By Mr. Lucas) You said the legislature changed the law but didn't provide the money. Now, they are eligible for state aid but it is unfunded now, is that what you are saying?
 
 
 446
 "A. The law was changed last year to permit in-city bus transportation but in changing the law the legislature said our department had to disburse the funds to the eligible existing areas which meant that since they did not increase the amount of funds appropriated we could not provide for in-city transportation.
 
 
 447
 "Q. If a child lives in the city and lives more than a mile and a half from the school to which he is assigned he may not receive the state aid because it is unfunded at the present time?
 
 
 448
 "A. That is correct.
 
 
 449
 "Q. But if he lives the same distance away and lived outside the City of Detroit, for example, then he could receive state aide?
 
 
 450
 "A. That is correct, or any other area."
 
 
 451
 The clearest example of direct State participation in encouraging the segregated condition of Detroit public schools, however, is that of school construction in Detroit and the surrounding suburban areas. Until 1962 the State Board of Education had direct statutory control over site planning for new school construction. During that time, as was pointed out above, the State approved school construction which fostered segregation throughout the Detroit Metropolitan area. (See supra pp. 235-239). Since 1962 the State Board has continued to be involved in approval of school construction plans.
 
 
 452
 IV. Conclusion as to Constitutional Violations
 
 
 453
 The discriminatory practices on the part of the Detroit School Board and the State of Michigan revealed by this record are significant, pervasive and causally related to the substantial amount of segregation found in the Detroit school system by the District Judge.
 
 
 454
 There is, of course, a significant distinction between this record and those school segregation cases which have flooded the courts since Brown v. Topeka, infra. This distinction is that Michigan has never enforced segregation by State laws which provided for separate black and white school systems, as was the pattern prior to 1954 in many other States. As a consequence, there always have been some instances of actual school integration in Detroit and still more instances of token school integration.
 
 
 455
 Defendants seek to insulate themselves from remedial action by federal courts by pointing to the long standing public policy of Michigan, as expressed in its statutes, of integration of public education. However, this court is not blind to the fact that governments can act only through the conduct of their officials and employees and that unconstitutional actions of individuals can be redressed. See, e. g., Clemons v. Board of Education, 228 F.2d 853 (6th Cir.), cert. denied, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956).
 
 
 456
 The record in this case amply supports the findings of the District Court of unconstitutional actions by public officials at both the local and State level.
 
 
 457
 Historically de jure segregation has come about through statutory command explicitly establishing dual school systems. Michigan's declared public policy is urged as a controlling distinction. No matter how important this distinction may be, it does not in our judgment negate the de jure segregation findings entered in this case by the District Judge. As said in United States v. The Board of School Commissioners of the City of Indianapolis, 474 F.2d 81, 83 (7th Cir. 1973): "[T]he actions of the Board of School Commissioners and its duly-appointed representatives and agents may be sufficient to constitute de jure segregation without being based on a state law, or even if they are in derogation of state law forbidding segregation."
 
 
 458
 The record contains substantial evidence to support the finding of the District Court that the segregation of the Detroit public schools, however rooted in private residential segregation, also was validated and augmented by the Detroit Board of Education and Michigan State Board action of pervasive influence through the system. Even if the segregation practices were a bit more subtle than the compulsory segregation statutes of Southern States, they were nonetheless effective.
 
 
 459
 It is our view that the findings of fact pertaining to actions of the Detroit Board of Education and the State of Michigan which caused or contributed to Detroit school segregation are not clearly erroneous and that the District Court was therefore authorized and required to take effective measures to desegregate the Detroit Public School System. Brown v. Board of Education of Topeka [I], 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Brown v. Board of Education of Topeka [II], 349 U.S. 294, 75 S. Ct. 753, 99 L.Ed. 1083 (1955); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L. Ed.2d 554 (1971); Davis v. Board of Commissioners, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971).
 
 
 460
 This record contains a substantial volume of testimony concerning local and State action and policies which helped produce residential segregation in Detroit and in the metropolitan area of Detroit. In affirming the District Judge's findings of constitutional violations by the Detroit Board of Education and by the State defendants resulting in segregated schools in Detroit, we have not relied at all upon testimony pertaining to segregated housing except as school construction programs helped cause or maintain such segregation.
 
 
 461
 V. The District Court's Ruling that no Detroit
 
 Only Desegregation Plan is Possible
 
 462
 Subsequent to the entry of its findings of constitutional violations on the part of the Detroit Board of Education and the State of Michigan resulting in system-wide segregation of Detroit public schools, the District Court requested plans for Detroit only desegregation. His findings of fact pertaining to these plans warrant repetition:
 
 
 463
 "FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DETROITONLY PLANS OF DESEGREGATION
 
 
 464
 "In accordance with orders of the court defendant Detroit Board of Education submitted two plans, limited to the corporate limits of the city, for desegregation of the public schools of the City of Detroit, which we will refer to as Plan A and Plan C; plaintiffs submitted a similarly limited plan, which will be referred to as the Foster Plan. Hearings were had on said plans on March 14, 15, 16, 17 and 21, 1972. In considering these plans the court does not limit itself to the proofs offered at the hearing just concluded; it considers as part of the evidence bearing on the issue (i. e., City-Only Plans) all proofs submitted in the case to this point, and it specifically incorporates herein by reference the Findings and Conclusions contained in its "Ruling on Issue of Segregation," filed September 27, 1971.
 
 
 465
 "The court makes the following factual findings:
 
 
 466
 "PLAN A.
 
 
 467
 "1. The court finds that this plan is an elaboration and extension of the socalled Magnet Plan, previously authorized for implementation as an interim plan pending hearing and determination on the issue of segregation.
 
 
 468
 "2. As proposed we find, at the high school level, that it offers a greater and wider degree of specialization, but any hope that it would be effective to desegregate the public schools of the City of Detroit at that level is virtually ruled out by the failure of the current model to achieve any appreciable success.
 
 
 469
 "3. We find, at the Middle School level, that the expanded model would affect, directly, about 24,000 pupils of a total of 140,000 in the grades covered; and its effect would be to set up a school system within the school system, and would intensify the segregation in schools not included in the Middle School program. In this sense, it would increase segregation.
 
 
 470
 "4. As conceded by its author, Plan A is neither a desegregation nor an integration plan.
 
 
 471
 "PLAN C.
 
 
 472
 "1. The court finds that Plan C is a token or part-time desegregation effort.
 
 
 473
 "2. We find that this plan covers only a portion of the grades and would leave the base schools no less racially identifiable.
 
 
 474
 "PLAINTIFFS' PLAN
 
 
 475
 "1. The court finds that Plaintiffs' Plan would accomplish more desegregation than now obtains in the system, or would be achieved under Plan A or Plan C.
 
 
 476
 "2. We find further that the racial composition of the student body is such that the plan's implementation would clearly make the entire Detroit public school system racially identifiable as Black.
 
 
 477
 "3. The plan would require the development of transportation on a vast scale which, according to the evidence, could not be furnished, ready for operation by the opening of the 1972-73 school year. The plan contemplates the transportation of 82,000 pupils and would require the acquisition of some 900 vehicles, the hiring and training of a great number of drivers, the procurement of space for storage and maintenance, the recruitment of maintenance and the not negligible task of designing a transportation system to service the schools.
 
 
 478
 "4. The plan would entail an overall recasting of the Detroit school system, when there is little assurance that it would not have to undergo another reorganization if a metropolitan plan is adopted.
 
 
 479
 "5. It would involve the expenditure of vast sums of money and effort which would be wasted or lost.
 
 
 480
 "6. The plan does not lend itself as a building block for a metropolitan plan.
 
 
 481
 "7. The plan would make the Detroit school system more identifiably Black, and leave many of its schools 75 to 90 per cent Black.
 
 
 482
 "8. It would change a school system which is now Black and White to one that would be perceived as Black, thereby increasing the flight of Whites from the city and the system, thereby increasing the Black student population.
 
 
 483
 "9. It would subject the students and parents, faculty and administration, to the trauma of reassignments, with little likelihood that such reassignments would continue for any appreciable time.
 
 
 484
 "In summary, we find that none of the three plans would result in the desegregation of the public schools of the Detroit school district.
 
 
 485
 "CONCLUSIONS OF LAW
 
 
 486
 "1. The court has continuing jurisdiction of this action for all purposes, including the granting of effective relief. See Ruling on Issue of Segregation, September 27, 1971.
 
 
 487
 "2. On the basis of the court's finding of illegal school segregation, the obligation of the school defendants is to adopt and implement an educationally sound, practicable plan of desegregation that promises realistically to achieve now and hereafter the greatest possible degree of actual school desegregation. Green v. County School Board, 391 U.S. 430, [88 S.Ct. 1689, 20 L.Ed.2d 716;] Alexander v. Holmes County Board of Education, 396 U.S. 19, [90 S.Ct. 29, 24 L.Ed.2d 19;] Carter v. West Feliciana Parish School Board, 396 U.S. 290, [90 S.Ct. 608, 24 L.Ed.2d 477;] Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, [91 S.Ct. 1267, 28 L. Ed.2d 554.]
 
 
 488
 "3. Detroit Board of Education Plans A and C are legally insufficient because they do not promise to effect significant desegregation. Green v. County School Board, supra, at 439-440, 88 S.Ct. 1689.
 
 
 489
 "4. Plaintiffs' Plan, while it would provide a racial mix more in keeping with the Black-White proportions of the student population than under either of the Board's plans or as the system now stands, would accentuate the racial identifiability of the district as a Black school system, and would not accomplish desegregation.
 
 
 490
 "5. The conclusion, under the evidence in this case, is inescapable that relief of segregation in the public schools of the City of Detroit cannot be accomplished within the corporate geographical limits of the city. The State, however, cannot escape its constitutional duty to desegregate the public schools of the City of Detroit by pleading local authority.
 
 
 491
 ******
 
 
 492
 * * *
 
 
 493
 "School district lines are simply matters of political convenience and may not be used to deny constitutional rights. If the boundary lines of the school districts of the City of Detroit and the surrounding suburbs were drawn today few would doubt that they could not withstand constitutional challenge. In seeking for solutions to the problem of school segregation, other federal courts have not "treated as immune from intervention the administrative structure of a state's educational system, to the extent that it affects the capacity to desegregate. Geographically or administratively independent units have been compelled to merge or to initiate or continue cooperative operation as a single system for school desegregation purposes."[1]
 
 
 494
 "That the court must look beyond the limits of the Detroit school district for a solution to the problem of segregation in the Detroit public schools is obvious; that it has the authority, nay more, the duty to (under the circumstances of this case) do so appears plainly anticipated by Brown II,[2] seventeen years ago. While other school cases have not had to deal with our exact situation,[3] the logic of their application of the command of Brown II supports our view of our duty.
 
 
 495
 The District Judge's finding that no Detroit only plan can achieve desegregation of the Detroit public school system points up another substantial distinction between this case and the classical school segregation case. This record presents a wholly new fact pattern in a school segregation case so far as this Circuit is concerned. This court never before has been confronted by a finding that any less comprehensive a solution than a metropolitan area plan would result in an all black school system immediately surrounded by practically all white suburban school systems, with an overwhelmingly white majority population in the total metropolitan area.
 
 
 496
 Relevant to and supportive of the District Judge's findings are these school census figures showing trends toward segregation in the Detroit schools during the last decade:
 
 
 497
 1960 100 of 251 schools were 90%
 
 
 498
 or more white
 
 
 499
 71 of 251 schools were 90%
 
 
 500
 or more black
 
 
 501
 68% of all schools were 90%
 
 
 502
 or more one race.
 
 
 503
 1970 69 of 282 schools were 90%
 
 
 504
 or more white
 
 
 505
 133 of 282 schools were 90%
 
 
 506
 or more black
 
 71.6% of all schools were
 
 507
 90% or more one race.
 
 1960-61 65.8% of the total number
 
 508
 of black students in regular
 
 
 509
 schools were 90% or more
 
 
 510
 black schools.
 
 1970-71 74.9% of the total number
 
 511
 of black students in regular
 
 
 512
 schools were in 90% or
 
 
 513
 more black schools.
 
 
 514
 This record reflects a present and expanding pattern of all black schools in Detroit (resulting in part from State action) separated only by school district boundaries from nearby all white schools. We cannot see how such segregation can be any less harmful to the minority students than if the same result were accomplished within one school district.
 
 
 515
 The boundaries of the Detroit school district are identical to the geographical boundaries of the City of Detroit. This means that the Detroit school district, like the City, contains within its boundaries two entirely separate cites (and school districts), Hamtramck and Highland Park, and surrounds a third City (and school district), Dearborn, on three sides. Immediately adjacent to the boundaries of the Detroit school district are seventeen school districts. An overwhelming majority of these districts, other than Detroit, Highland Park, River Rouge and Hamtramck, are entirely white or contain only a token number of black students.
 
 
 516
 Like the District Judge, we see no validity to an argument which asserts that the constitutional right to equality before the law is hemmed in by the boundaries of a school district.
 
 
 517
 A. Status of School Districts under Michigan Law
 
 
 518
 This conclusion is supported by the status of school districts under Michigan law and by the historial control exercised over local school districts by the legislature of Michigan and by State agencies and officials, which we now discuss.
 
 
 519
 As held by the District Court, it is well established under the Constitution and laws of Michigan that the public school system is a State function and that local school districts are instrumentalities of the State created for administrative convenience.
 
 
 520
 The Northwest Ordinance of 1787 governing the Territory of Michigan provided:
 
 
 521
 "Religion, morality and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Art. III.
 
 
 522
 With this genesis, Michigan's four Constitutions have clearly established that the public school system in that State is solely a State function. The Constitution of 1835 in Article X, Section 3, provided, in part: "The legislature shall provide for a system of common schools . . ." The Constitution of 1850, Article XIII, Section 4, provided, in part: "The legislature shall . . . provide for and establish a system of primary schools . . ." Section 1 of the same Article provided, ". . . the Superintendent of Public Instruction shall have general supervision of public instruction . . ."
 
 
 523
 The Constitution of 1908 in Article XI, Section 2, provided that the Superintendent of Public Instruction "shall have general supervision of public instruction in the State." Article XI, Section 9, provided, in part as follows:
 
 
 524
 "The legislature shall continue a system of primary schools, whereby every school district in the State shall provide for the education of pupils without charge for tuition . . ."
 
 
 525
 The Constitution of 1963, the present Constitution of the State of Michigan, in Article VIII, Section 2, provides, in part as follows:
 
 
 526
 "The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law."
 
 
 527
 In interpreting the above educational provisions of the Constitution of 1850, the Michigan Supreme Court stated: "The school district is a state agency. Moreover, it is of legislative creation . . ." Attorney General v. Lowrey, 131 Mich. 639, 644, 92 N.W. 289, 290 (1902). Again, interpreting the Constitution of 1850, the Supreme Court of Michigan in Attorney General v. Detroit Board of Education, 154 Mich. 584, 590, 118 N.W. 606, 609 (1908), adopted lower court language which read:
 
 
 528
 "Education in Michigan belongs to the state. It is no part of the local self-government inherent in the township or municipality, except so far as the Legislature may choose to make it such. The Constitution has turned the whole subject over to the Legislature . . ."
 
 
 529
 The Supreme Court of Michigan interpreted Article XI, Section 9, of the Constitution of 1908 to mean:
 
 
 530
 "The Legislature has entire control over the schools of the state subject only to the provisions above referred to. The division of the territory of the state into districts, the conduct of the school, the qualifications of teachers, the subjects to be taught therein, are all within its control." Child Welfare v. Kennedy School Dist., 220 Mich. 290, 296, 189 N.W. 1002, 1004 (1922).
 
 
 531
 In the leading case concerning construction of this section of the Michigan Constitution of 1963, the Michigan Supreme Court said:
 
 
 532
 "It is the responsibility of the state board of education to supervise the system of free public schools set up by the legislature and, as a part of that responsibility, to promulgate regulations specifying the number of hours necessary to constitute a school day for elementary school students as well as for other classifications or groupings of students, to determine the curricula and, in general, to exercise leadership and supervision over the public school system." Welling v. Livonia Board of Education, 382 Mich. 620, 624, 171 N.W.2d 545, 546 (1969). See also Governor v. State Treasurer, 389 Mich. 1, 13, 203 N.W.2d 457 (1972).
 
 
 533
 Michigan has not treated its school districts as sacrosanct. To the contrary, Michigan always has regarded education as the fundamental business of the State as a whole. Local school districts are creatures of the State and act as instrumentalities of the State under State control. Cf. Senghas v. L'Anse Creuse Public Schools, 368 Mich. 557, 118 N.W.2d 975 (1962); McLaughlin v. Board of Education, 255 Mich. 667, 239 N.W. 374 (1931).
 
 
 534
 The record discloses a number of examples of State control over local public education in Michigan.
 
 
 535
 1. Following the holding of Welling v. Livonia Board of Education, supra, that there was no minimum length of day required under the 180-day school attendance rule absent a State Board of Education regulation, the Michigan State Board of Education, acting under its Constitutional mandate without legislative authority, established an administrative rule requiring local school boards to provide a minimum number of hours per school year. See, School Districts Child Account for Distribution of State Aid, Bulletin No. 1005, Michigan State Department of Education (1970).
 
 
 536
 2. Public Act 289 of 1964 (M.S.A. Sec. 15.2299(1) et seq., M.C.L.A. Sec. 388.681 et seq.) required Michigan school districts to operate K-12 systems. When Public Act 289 became effective, 1,438 public school districts existed in Michigan. By the beginning of 1968, this figure had been reduced to 738, meaning that 700 school districts in Michigan have disappeared since 1964 through reorganization. Annual Report, Committee on School District Reorganization, 1968 Journal of the Senate 422-423 (March 1, 1968).
 
 
 537
 3. Pursuant to Act 289 of 1964, supra, the State Board of Education ordered the merger of the Brownstown No. 10, Hand, Maple Grove and Carson school districts, all in Wayne County. The action is best explained by the fact that Brownstown was, at that time, the wealthiest school district in the State, indeed, with a property valuation of $340,000 backing each child, perhaps the wealthiest district in the nation, while the other three districts were extremely poor.
 
 
 538
 4. When the Sumpter School District was on the verge of bankruptcy in 1968, the State Board of Education, acting under Public Act 239 of 1967 (M.S.A. Sec. 15.2299(51) et seq., M.C.L.A. Sec. 388.711 et seq.), merged the district with four adjoining districts, including the Airport School District. Significantly, though Sumpter was in Wayne County, Airport was in Monroe County, showing that county lines are not inviolate in Michigan.
 
 
 539
 5. The Nankin Mills School District in Wayne County was beset with financial problems and had no high school. Again, pursuant to Act 239, the State Board of Education in 1969 ordered this school district to merge with the Livonia, Garden City and Wayne Community schools.
 
 
 540
 6. When the Inkster School District in Wayne County was on the verge of financial bankruptcy, the Michigan legislature passed Public Act 32 of 1968 (M.S.A. Sec. 15.1916 et seq., M.C.L.A. Sec. 388.201 et seq.) enabling the district to borrow $705,000 but on the condition that if the district could not balance its budget, the State Board of Education could reorganize, merge or annex the district. The legislative history of Act 32 indicates at least two legislators voted against the bill in the House of Representatives because of the excessive control given to the State Board of Education:
 
 
 541
 "I voted No on House Bill No. 3332 because in setting up the machinery to bail out distressed districts, it takes from the local communities the control over their own educational system by providing for excessive arbitrary reorganization powers in the hands of the Board of Education . . ."
 
 
 542
 "This bill certainly sets up the State Board of Education to be a dictator of all school districts that run into financial problems." 1968 Journal of the House of Representatives 1965.
 
 
 543
 7. Too small and too poor to operate a high school, the all-black Carver School District in suburban Oakland County reached a crisis in 1960 when other surrounding white districts refused to accept Carver pupils on a tuition basis. The Carver district was merged with Oak Park.
 
 
 544
 8. The State Board of Education and Superintendent of Public Instruction may withhold State aid for failure to operate the minimum school year. M.S.A. Sec. 15.3575, M.C.L.A. Sec. 340.575. In 1970, funds were withheld from the City of Grand Rapids School District. 17 Michigan School Board Journal 3 (March, 1970). For Attorney General Opinions holding that State aid may be withheld by the State Board of Education from school districts for hiring uncertified teachers, defaulting on State loans and for other reasons, see Op.Atty.Gen. No. 880, 1949-1950 Report of the Attorney General 104 (January 24, 1949, Roth); No. 2333, 1955 Report of the Attorney General 561 (October 20, 1955, Kavanaugh); No. 4097, 1961-1962 Report of the Attorney General 553 (October 8, 1962, Kelley).
 
 
 545
 9. The State of Michigan contributes, on the average, 34% of the operating budgets of the 54 school districts included in the proposed Metropolitan Plan of Integration. In eleven of the 54 districts, the State's contribution exceeds 50% and in eight more, it exceeds 40%. State aid is appropriated from the General Fund, revenue raised through state-wide taxation, and is distributed annually to the local school districts under a formula devised by the legislature. See, e. g., Public Act 134 (1971), M.S.A. Sec. 15.1919(51), M.C.L.A. Sec. 388.611.
 
 
 546
 Though the local school districts obtain funds from the assessment of local property, the ultimate authority in insuring equalized property valuations throughout the State is the State Tax Commission. M.S.A. Sec. 7.631 et seq., M. C.L.A. Sec. 209.101 et seq.; M.S.A. Sec. 7.206, M.C.L.A. Sec. 211.148; M.S.A. Sec. 7.52, M.C.L.A. Sec. 211.34. The State's duty to equalize is required by the Michigan Constitution, Article IX, Section 3. This "State equalized valuation" serves as the basis for calculating local revenue yields. See, Ranking of Michigan Public High School-School Districts by Selected Financial Data, 1970, Bulletin 1012, Michigan State Department of Education (1971).
 
 
 547
 10. The Michigan School Code reaffirms the ultimate control of the State over public education. Local school districts must observe all State laws relating to schools,[1] hold school a minimum number of days per year,[2] employ only certified teachers,[3] teach civics, health and physical education and drivers' education,[4] excuse students to attend religious instruction classes,[5] observe State requirements when teaching sex education,[6] make annual financial and other reports to the Superintendent of Public Instruction,[7] adopt only textbooks which are listed with the Superintendent of Public Instruction[8] and must follow all rules and regulations of the State Department of Education.
 
 
 548
 Local school districts, unless they have the approval of the State Board of Education or the Superintendent of Public Instruction, cannot consolidate with another school district,[9] annex territory,[10] divide or attach parts of other districts,[11] borrow monies in anticipation of State aid,[12] or construct, reconstruct or remodel school buildings or additions to them.[13]
 
 
 549
 The power to withhold State aid, of course, effects enormous leverage upon any local school district, since on the average 34 per cent of the operation budget of the 54 school districts included in the proposed Metropolitan Plan is paid for by the State.
 
 
 550
 In the instance of the City of Detroit, the State exhibited its understanding of its power over the local school district by the adoption of Act 48 of the Public Acts of 1970 which repealed a high school desegregation plan previously adopted by the Detroit Board of Education. See 433 F.2d 897.
 
 B. De Jure Acts of Segregation
 
 551
 Thus, the record establishes that the State has committed de jure acts of segregation and that the State controls the instrumentalities whose action is necessary to remedy the harmful effects of the State acts. There can be little doubt that a federal court has both the power and the duty to effect a feasible desegregation plan. Indeed, such is the essence of Brown II. Brown v. Board of Education, 349 U.S. 294, 300-301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). In the instant case the only feasible desegregation plan involves the crossing of the boundary lines between the Detroit School District and adjacent or nearby school districts for the limited purpose of providing an effective desegregation plan. The power to disregard such artificial barriers is all the more clear where, as here, the State has been guilty of discrimination which had the effect of creating and maintaining racial segregation along school district lines. See Section III B, pp. 238-241, supra. United States v. Scotland Neck Board of Education, 407 U.S. 484, 489, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972); Wright v. City of Emporia, 407 U.S. 451, 463, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972); United States v. State of Texas, 447 F.2d 441, 443-444 (5th Cir. 1971); Haney v. County Board of Education of Sevier County, 429 F.2d 364, 368 (8th Cir. 1970). See also Davis v. Board of School Commissioners, 402 U.S. 33, 36-38, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971).
 
 
 552
 There exists, however, an even more compelling basis for the District Court's crossing artificial boundary lines to cure the State's constitutional violations. The instant case calls up haunting memories of the now long overruled and discredited "separate but equal doctrine" of Plessy v. Ferguson, 163 U.S. 537, 16 S. Ct. 1138, 41 L.Ed. 256 (1896). If we hold that school district boundaries are absolute barriers to a Detroit school desegregation plan, we would be opening a way to nullify Brown v. Board of Education which overruled Plessy, supra.
 
 
 553
 This court in considering this record finds it impossible to declare "clearly erroneous" the District Judge's conclusion that any Detroit only desegregation plan will lead directly to a single segregated Detroit school district overwhelmingly black in all of its schools, surrounded by a ring of suburbs and suburban school districts overwhelmingly white in composition in a State in which the racial composition is 87 per cent white and 13 per cent black.
 
 
 554
 We deal with a record which demonstrates more than ample support for the District Judge's findings of unconstitutional segregation by race resulting in major part from action and inaction of public authorities, both local and State. This segregation is found in the school system of the inner city of a metropolitan area 81% white against 19% nonwhite. Under this record a remedial order of a court of equity which left the Detroit school system overwhelmingly black (for the foreseeable future) surrounded by suburban school systems overwhelmingly white cannot correct the constitutional violations herein found.
 
 
 555
 VI. The District Judge's Order to Prepare A Metropolitan Area Desegregation Plan
 
 
 556
 The third major issue in this case pertains to the validity of the District Judge's ruling on desegregation area and order for development of a plan of desegregation dated June 14, 1972, accompanied by a statement of findings of facts and conclusions of law in support thereof, reported at 345 F.Supp. 914.
 
 
 557
 At the outset it is obvious from what we have said pertaining to the inadequacy of any Detroit only desegregation plan that this court feels that some plan for desegregation beyond the boundaries of the Detroit School District is both within the equity powers of the District Court and essential to a solution of this problem. We reiterate this, keeping in mind the admonition from Chief Justice Marshall:
 
 
 558
 "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803).
 
 
 559
 We reject the contention that school district lines are sacrosanct and that the jurisdiction of the District Court to grant equitable relief in the present case is limited to the geographical boundaries of Detroit. We reiterate that school districts and school boards are instrumentalities of the State. See Cooper v. Aaron, 358 U.S. 1, 16, 78 S.Ct. 1401, 3 L. Ed.2d 5 (1958). As early as Brown II the Supreme Court pointed out that:
 
 
 560
 "[T]he courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, . . . ." 349 U.S. at 300-301, 75 S.Ct. at 756.
 
 
 561
 The Supreme Court has held that school boundary lines cannot be changed or new school systems created where the result is a larger imbalance in racial ratios in school systems where all vestiges of enforced racial segregation have not been eliminated. United States v. Scotland Neck Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972); Wright v. Council of the City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). This is true regardless of "dominant purpose." Wright v. City of Emporia, 407 U.S. at 462, 92 S.Ct. 2196.
 
 
 562
 If school boundary lines cannot be changed for an unconstitutional purpose, it follows logically that existing boundary lines cannot be frozen for an unconstitutional purpose.
 
 
 563
 We therefore conclude that the District Court in the present case is not confined to the boundary lines of Detroit in fashioning equitable relief.
 
 
 564
 Bradley v. School Board of the City of Richmond, 462 F.2d 1058 (4th Cir. 1972), aff'd by an equally divided court, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973), is distinguishable in several respects. In that case the District Court ordered an actual consolidation of three separate school districts, all of which the Court of Appeals for the Fourth Circuit declared to be unitary. In the instant case the District Court has not ordered consolidation of school districts, but directed a study of plans for the reassignment of pupils in school districts comprising the metropolitan area of Detroit. In the Richmond case the court found that neither the Constitution nor statutes of Virginia, previously or presently in effect, would have permitted the State Board of Education, acting alone, to have effected a consolidation of the three school districts into a single system under the control of a single school board. The Fourth Circuit held that compulsory consolidation of political subdivisions of the State of Virginia was beyond the power of a federal court because of the Tenth Amendment to the Constitution of the United States. The decisions which now are under review did not contemplate such a restructuring.
 
 
 565
 Furthermore, the court in the Richmond case cited provisions of the Constitution and statutes of Virginia in support of its holding that-
 
 
 566
 "The power to operate, maintain and supervise public schools in Virginia is, and always has been, within the exclusive jurisdiction of the local school boards and not within the jurisdiction of the State Board of Education." 462 F.2d at 1067.
 
 
 567
 The record in the present case amply supports the finding that the State of Michigan has not been subject to such limitations in its dealings with local school boards.
 
 
 568
 VII. Rights of Other School Districts To Be Made Parties and To Be Heard
 
 
 569
 In his "Ruling on Propriety of Considering a Metropolitan Remedy" the District Court defined the metropolitan area "for the present purposes" to comprise the three counties of Wayne, Oakland and Macomb. In his "Findings of Fact and Conclusions of Law in Support of Ruling on Desegregation Area and Development Plans" the District Court noted that "the court has taken no proofs with respect to the establishment of the boundaries in the counties of Wayne, Oakland and Macomb." In his "Ruling on Desegregation Area and Order for Development of Plan of Desegregation," the District Court defined the desegregation area to include some 53 school districts. Certain of these school districts have intervened in this case, but have not yet been afforded an opportunity to offer proof. Some of the other school districts are not parties to the litigation.
 
 
 570
 In United States v. Texas Education Agency, 467 F.2d 848, 873 (5th Cir. 1972), the Court said:
 
 
 571
 "The discriminatory acts of the school authorities infect the entire school system; they are particularly obvious in the so-called 'pockets'. Some schools may be the 'result' of state-imposed segregation even though no specific discriminatory school board action may be shown as to those schools. Had the school authorities not specifically segregated the minority students in certain schools other schools may have developed as desegregated facilities. Thus, though they may not be 'pockets of discrimination', these schools are the 'results' of discrimination."
 
 
 572
 Under the authorities heretofore discussed, these school districts are arms and instrumentalities of the State of Michigan. Nevertheless, under Michigan law, they may sue and be sued. See M.S.A. Secs. 15.3154, 15.3192, M.C. L.A. Secs. 340.154, 340.192.
 
 
 573
 Rule 19, Fed.R.Civ.P., provides that a person who is subject to service of process shall be joined as a party to the action if "in his absence complete relief cannot be accorded among those already parties." Under this rule joinder of necessary parties is required if jurisdiction over them can be obtained and if joinder will not defeat federal jurisdiction of the case.
 
 
 574
 We hold that school districts which are to be affected by the decree of the District Court are "necessary parties" under Rule 19. As a prerequisite to the implementation of a plan in this case affecting any school district, the affected district first must be made a party to this litigation and afforded an opportunity to be heard.
 
 
 575
 While agreeing with the District Court in its conclusion that it can consider a metropolitan remedy, we express no views as to the desegregation area set forth in the orders of the District Court.
 
 
 576
 We vacate the order of March 24, 1972, entitled "Ruling on Propriety of a Metropolitan Remedy to Accomplish Desegregation of the Public Schools of Detroit."
 
 
 577
 This Court recognizes that, as set forth above, the legislature of the State of Michigan has power to provide a complete remedy for the unconstitutional segregation disclosed in this record. It, too, has responsibility for following the great mandates of the United States Constitution.
 
 
 578
 If, however, the legislature fails to act, or it it acts in a manner inconsistent with the expeditious and efficient elimination of the unconstitutional practices and conditions described in this opinion, the District Court shall proceed to fashion such a remedy, including an interim remedy if found to be necessary, as it shall determine to be appropriate within the guidelines of this opinion.
 
 
 579
 On remand, any party against whom relief is sought, including school districts which heretofore have intervened and school districts which hereafter may become parties to this litigation, shall be afforded an opportunity to offer additional evidence, and to cross-examine available witnesses who previously have testified, on any issue raised by the pleadings, including amendments thereto, as may be relevant and admissible to such issues. The District Court may consider any evidence now on file and such additional competent evidence as may be introduced by any party. However, the District Court will not be required to receive any additional evidence as to the matters contained in its Ruling on the Issue of Segregation, dated September 27, 1971, and reported at 338 F. Supp. 582, or its Findings of Fact and Conclusions of Law on the "Detroitonly" plans of desegregation, dated March 28, 1972. We hold that the findings of fact contained in these rulings are not clearly erroneous, Rule 52(a), Fed.R.Civ.P., but to the contrary are supported by substantial evidence.
 
 
 580
 Upon remand, the plaintiffs and other parties shall be permitted to amend their pleadings to conform to the evidence (see Rule 15(b), Fed.R.Civ.P.), to add additional parties and to ask for any additional appropriate relief, the details of such amendments to be under the continuing supervision of the District Court.
 
 
 581
 We also vacate the District Court's Ruling on Desegregation Area and Development Plan, dated June 14, 1972, reported at 345 F.Supp. 914, except those parts of the order appointing a panel charged with the duty of preparing interim and final plans of desegregation. The panel appointed by the District Court is authorized to proceed with its studies and planning under the direction of the District Court. Pending further orders of the District Court or this Court, the defendants and school districts involved will continue to supply administrative and staff assistance to the panel upon its request. Until further order of the court, the reasonable costs incurred by the panel will be paid as provided by the District Court's order of June 14, 1972.
 
 
 582
 The order of the District Court directing the purchase of school buses, dated July 11, 1972, also is vacated, subject to the right of the District Court, in its discretion, to consider the entry of another order requiring the purchase of school buses at the appropriate time.
 
 VIII. Equitable Relief
 
 583
 In this opinion we have emphasized the broad powers of a District Court to fashion equitable relief in school desegregation cases. For the guidance of the District Court on remand, we now review the decisions on this subject in further depth.
 
 1) The Fundamental Constitutional Holding:
 
 584
 "We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment." Brown v. Board of Education, 347 U. S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954).
 
 
 585
 2) The Supreme Court's Initial Description of the Equitable Remedy:
 
 
 586
 "In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies[4] and by a facility for adjusting and reconciling public and private needs.[5] These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.
 
 
 587
 "While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system. During this period of transition, the courts will retain jurisdiction of these cases." Brown v. Board of Education of Topeka [II], 349 U.S. 294, 300-301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955).
 
 3) Delay Is No Longer Tolerable:
 
 588
 "In determining whether respondent School Board met that command by adopting its 'freedom-of-choice' plan, it is relevant that this first step did not come until some 11 years after Brown I was decided and 10 years after Brown II directed the making of a 'prompt and reasonable start.' This deliberate perpetuation of the unconstitutional dual system can only have compounded the harm of such a system. Such delays are no longer tolerable, for 'the governing constitutional principles no longer bear the imprint of newly enunciated doctrine.' Watson v. City of Memphis, supra, 373 U.S. at 529, 83 S.Ct. 1314, 10 L.Ed. 2d 529; see Bradley v. School Board, supra; Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265. Moreover, a plan that at this late date fails to provide meaningful assurance of prompt and effective disestablishment of a dual system is also intolerable. 'The time for mere "deliberate speed" has run out,' Griffin v. County School Board, 377 U.S. 218, 234, 84 S.Ct. 1226, 12 L.Ed.2d 256; 'the context in which we must interpret and apply this language [of Brown II] to plans for desegregation has been significantly altered.' Goss v. Board of Education, 373 U.S. 683, 689, 83 S.Ct. 1405, 10 L.Ed.2d 632. See Calhoun v. Latimer, 377 U.S. 263, 84 S.Ct. 1235, 12 L.Ed.2d 288. The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now." Green v. County School Board, 391 U.S. 430, 438-439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968) (Emphasis added.)
 
 
 589
 4) State Imposed Segregation Must be Completely Removed at Earliest Practicable Date:
 
 
 590
 "The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation. There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness. Where the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system 'at the earliest practicable date,' then the plan may be said to provide effective relief. Of course, the availability to the board of other more promising courses of action may indicate a lack of good faith; and at the least it places a heavy burden upon the board to explain its preference for an apparently less effective method. Moreover, whatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed. See No. 805, Raney v. Board of Education, post, 391 U.S. 443 at 449, 88 S.Ct. 1697, 20 L.Ed.2d 727." Green v. County School Board, 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716 (1968) (Emphasis added.)
 
 
 591
 5) The Court Has The Power and The Duty to Eliminate Effects of Past Discrimination:
 
 
 592
 "We bear in mind that the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965). (Emphasis added). Compare the remedies discussed in, e. g., NLRB v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219 (1939); United States v. Crescent Amusement Co., 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160 (1944); Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L. Ed. 619 (1911). See also Griffin v. County School Board, 377 U.S. 218, 232-234, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). Green v. County School Board, 391 U.S. 430, n. 4 at 438, 88 S. Ct. 1689, 20 L.Ed.2d 716 (1968) (relating to the remedial command of Brown II).
 
 6) Resegregation is Impermissible:
 
 593
 "Like the transfer provisions held invalid in Goss v. Board of Education, 373 U.S. 683, 686, 83 S.Ct. 1405, 10 L.Ed.2d 632 '[i]t is readily apparent that the transfer [provision] lends itself to perpetuation of segregation.' While we there indicated that 'freetransfer' plans under some circumstances might be valid, we explicitly stated that 'no official transfer plan or provision of which racial segregation is the inevitable consequence may stand under the Fourteenth Amendment.' Id., at 689, 83 S.Ct. at 1409. So it is here; no attempt has been made to justify the transfer provision as a device designed to meet 'legitimate local problems,' ibid.; rather it patently operates as a device to allow resegregation of the races to the extent desegregation would be achieved by geographically drawn zones. Respondent's argument in this Court reveals its purpose. We are frankly told in the Brief that without the transfer option it is apprehended that while students will flee the school system altogether. 'But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.' Brown II, 349 U.S. at 300, 75 S.Ct. at 756.
 
 
 594
 "We do not hold that 'free transfer' can have no place in a desegregation plan. But like 'freedom of choice,' if it cannot be shown that such a plan will further rather than delay conversion to a unitary, nonracial, nondiscriminatory school system, it must be held unacceptable. See Green v. County School Board, supra, 391 U.S. at 439-441, 88 S.Ct. 1689.
 
 
 595
 "We conclude, therefore, that the Board 'must be required to formulate a new plan and, in light of other courses which appear open to the Board, . . . fashion steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools." Id., at 442, 88 S.Ct. 1689. Monroe v. Board of Commissioners, 391 U.S. 450, 459-460, 88 S.Ct. 1700, 1705, 20 L.Ed.2d 733 (1968) (Emphasis added.)
 
 7) The Remedial Tools:
 
 596
 In Swann v. Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed. 2d 554 (1971), Chief Justice Burger, writing for a unanimous Court, said:
 
 
 597
 "If school authorities fail in their affirmative obligations under these holdings, judicial authority may be invoked. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.
 
 
 598
 'The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.' Hecht Co. v. Bowles, 321 U.S. 321, 329-330, 64 S.Ct. 587, 88 L.Ed. 754 (1944), cited in Brown II, supra, 349 U.S. at 300, 75 S.Ct. 753."
 
 
 599
 a) The Flexible Ratio:
 
 
 600
 "As the voluminous record in this case shows, the predicate for the District Court's use of the 71%-29% ratio was twofold: first, its express finding, approved by the Court of Appeals and not challenged here, that a dual school system had been maintained by the school authorities at least until 1969; second, its finding, also approved by the Court of Appeals, that the school board had totally defaulted in its acknowledged duty to come forward with an acceptable plan of its own, notwithstanding the patient efforts of the District Judge who, on at least three occasions, urged the board to submit plans. As the statement of facts shows, these findings are abundantly supported by the record. It was because of this total failure of the school board that the District Court was obliged to turn to other qualified sources, and Dr. Finger was designated to assist the District Court to do what the board should have done.
 
 
 601
 "We see therefore that the use made of mathematical ratios was no more than a starting point in the process of shaping a remedy, rather than an inflexible requirement. From that starting point the District Court proceeded to frame a decree that was within its discretionary powers, as an equitable remedy for the particular circumstances. As we said in Green, a school authority's remedial plan or a district court's remedial decree is to be judged by its effectiveness. Awareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional violations. In sum, the very limited use made of mathematical ratios was within the equitable remedial discretion of the District Court." Swann v. Board of Education, 402 U.S. 1, 24-25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971).
 
 
 602
 b) Noncontiguous School Zoning:
 
 
 603
 "The maps submitted in these cases graphically demonstrate that one of the principal tools employed by school planners and by courts to break up the dual school system has been a frank-and sometimes drastic-gerrymandering of school districts and attendance zones. An additional step was pairing, 'clustering,' or 'grouping' of schools with attendance assignments made deliberately to accomplish the transfer of Negro students out of formerly segregated Negro schools and transfer of white students to formerly all-Negro schools. More often than not, these zones are neither compact nor contiguous; indeed they may be on opposite ends of the city. As an interim corrective measure, this cannot be said to be beyond the broad remedial powers of a court.
 
 
 604
 "Absent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis. All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems.
 
 
 605
 "No fixed or even substantially fixed guidelines can be established as to how far a court can go, but it must be recognized that there are limits. The objective is to dismantle the dual school system. 'Racially neutral' assignment plans proposed by school authorities to a district court may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authorities present a district court with a 'loaded game board,' affirmative action in the form of remedial altering of attendance zones is proper to achieve truly non-discriminatory assignments. In short, an assignment plan is not acceptable simply because it appears to be neutral.
 
 
 606
 "In this area, we must of necessity rely to a large extent, as this Court has for more than 16 years, on the informed judgment of the district courts in the first instance and on courts of appeals.
 
 
 607
 "We hold that the pairing and grouping of noncontiguous school zones is a permissible tool and such action is to be considered in light of the objectives sought. Judicial steps in shaping such zones going beyond combinations of contiguous areas should be examined in light of what is said in subdivisions (1), (2), and (3) of this opinion concerning the objectives to be sought. Maps do not tell the whole story since noncontiguous school zones may be more accessible to each other in terms of the critical travel time, because of traffic patterns and good highways, than schools geographically closer together. Conditions in different localities will vary so widely that no rigid rules can be laid down to govern all situations." Swann v. Board of Education, supra, at 27-9, 91 S.Ct. at 1281-1282. (Emphasis added.)
 
 
 608
 c) Transportation of Students:
 
 
 609
 "The scope of permissible transportation of students as an implement of a remedial decree has never been defined by this Court and by the very nature of the problem it cannot be defined with precision. No rigid guidelines as to student transportation can be given for application to the infinite variety of problems presented in thousands of situations. Bus transportation has been an integral part of the public education system for years, and was perhaps the single most important factor in the transition from the one-room schoolhouse to the consolidated school. Eighteen million of the Nation's public school children, approximately 39%, were transported to their schools by bus in 1969-1970 in all parts of the country.
 
 
 610
 "The importance of bus transportation as a normal and accepted tool of educational policy is readily discernible in this and the companion case, Davis, supra. The Charlotte school authorities did not purport to assign students on the basis of geographically drawn zones until 1965 and then they allowed almost unlimited transfer privileges. The District Court's conclusion that assignment of children to the school nearest their home serving their grade would not produce an effective dismantling of the dual system is supported by the record.
 
 
 611
 "Thus the remedial techniques used in the District Court's order were within that court's power to provide equitable relief; implementation of the decree is well within the capacity of the school authority.
 
 
 612
 "The decree provided that the buses used to implement the plan would operate on direct routes. Students would be picked up at schools near their homes and transported to the schools they were to attend. The trips for elementary school pupils average about seven miles and the District Court found that they would take 'not over 35 minutes at the most.' This system compares favorably with the transportation plan previously operated in Charlotte under which each day 23,600 students on all grade levels were transported an average of 15 miles one way for an average trip requiring over an hour. In these circumstances, we find no basis for holding that the local school authorities may not be required to employ bus transportation as one tool of school desegregation. Desegregation plans cannot be limited to the walk-in school.
 
 
 613
 "An objection to transportation of students may have validity when the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process. District courts must weigh the soundness of any transportation plan in light of what is said in subdivisions (1), (2), and (3) above. It hardly needs stating that the limits on time of travel will vary with many factors, but probably with none more than the age of the students. The reconciliation of competing values in a desegregation case is, of course, a difficult task with many sensitive facets but fundamentally no more so than remedial measures courts of equity have traditionally employed." Swann v. Board of Education, supra, at 29-31, 91 S.Ct. at 1282-1283. (Emphasis added.)
 
 
 614
 In North Carolina v. Swann, 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971), the Chief Justice said: "As noted in Swann, supra, 402 U.S. at 29, 91 S.Ct. at 1282, bus transportation has long been an integral part of all public educational systems, and it is unlikely that a truly effective remedy could be devised without continued reliance on it."
 
 
 615
 d) Equity Power to Require Payment of Tax Funds for Integrated Schools:
 
 
 616
 In the exercise of its equity powers, a District Court may order that public funds be expended, particularly when such an expenditure is necessary to meet the minimum requirements mandated by the Constitution. Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 233, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Eaton v. New Hanover County Board of Education, 459 F.2d 684 (4th Cir. 1972); Brewer v. School Board of City of Norfolk, 456 F. 2d 943, 947, 948 (4th Cir.), cert. denied, 406 U.S. 933, 92 S.Ct. 1778, 32 L.Ed.2d 136 (1972); Plaquemines Parish School Board v. United States, 415 F.2d 817 (5th Cir. 1969).
 
 
 617
 This opinion heretofore has emphasized that the Legislature of Michigan has an opportunity to determine the organizational and governmental structure of an enlarged desegregation area to remedy the unconstitutional segregation results set forth in this opinion. In the event the Legislature fails to act effectively and expeditiously, the foregoing and other cases cited in this opinion outline the broad scope of equitable relief that may be fashioned by the District Court in this case on remand after all school districts to be affected are afforded an opportunity to be heard as hereinabove provided.
 
 IX. Other Issues
 
 618
 Numerous other issues are presented which do not require discussion.
 
 
 619
 We do not consider it necessary to construe the "Broomfield Amendment," Pub.L. No. 92-318, 86 Stat. 235, Sec. 803, known as the Education Amendments of 1972, since no final desegregation order has been entered. Deal v. Cincinnati Board of Education, 419 F.2d 1387, 1392 (6th Cir. 1969), cert. denied, 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971) is not controlling. There the District Court made findings of fact that there had been no unconstitutional conduct on the part of the Cincinnati Board of Education. This court held that these findings of fact were not clearly erroneous. Rule 52(a), Fed.R. Civ.P.
 
 
 620
 All other contentions presented by the parties contrary to the conclusions reached in this opinion have been considered and are found to be without merit.
 
 X. Conclusion
 
 621
 1. The Ruling of the District Court on the Issue of Segregation, dated September 27, 1971, and reported at 338 F. Supp. 582, is affirmed.
 
 
 622
 2. The findings of fact and conclusions of law on "Detroit-only" plans of desegregation, dated March 28, 1972, are affirmed.
 
 
 623
 3. The Ruling on Propriety of a Metropolitan Remedy to Accomplish Desegregation of the Public Schools of the City of Detroit, dated March 24, 1972, is affirmed in part, but vacated for the reasons set forth above.
 
 
 624
 4. The Ruling on Desegregation Area and Development of Plan, dated June 14, 1972, and reported at 345 F. Supp. 914, is vacated except as hereinabove prescribed.
 
 
 625
 5. The order dated July 11, 1972, directing the purchase of school buses is vacated.
 
 
 626
 The case is remanded to the District Court for further proceedings not inconsistent with this opinion.
 
 
 627
 No costs are taxed. Each party will bear his own costs.
 
 
 628
 EDWARDS, CELEBREZZE, PECK, McCREE, and LIVELY, Circuit Judges, concur.
 
 WEICK, Circuit Judge (dissenting):
 
 629
 Eighty-seven years before the landmark decision of the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) was announced, the legislature of the State of Michigan, in Public Acts of Michigan, 1867, Act 34 Sec. 28, had abolished segregation in the public school system which had prohibited Negro children from attending the same public schools as white children. This statute in relevant parts reads as follows:
 
 
 630
 "All residents of any district shall have an equal right to attend any school therein. . . ."
 
 
 631
 The Supreme Court of Michigan, in an opinion written for the court by Chief Justice Cooley, construed the statute in 1869 and held it applicable to Detroit and that Detroit constituted one school district. In granting a writ of mandamus requiring the school board to admit a Negro child who had been denied admission, Chief Justice Cooley said:
 
 
 632
 "It cannot be seriously urged that with this provision in force, the school board of any district which is subject to it may make regulations which would exclude any resident of the district from any of its schools, because of race or color, or religious belief, or personal peculiarities. It is too plain for argument that an equal right to all of the schools, irrespective of such distinctions, was meant to be established." People, ex rel. Workman v. Board of Education of Detroit, 18 Mich. 400, 409 (1869).
 
 
 633
 The issues in this case do not concern the right of any Negro child in Detroit to attend any school he desires in that City. They do involve the authority of a district judge to adopt a so-called metropolitan plan designed to integrate the Negro school children living in Detroit with white children living in three adjoining counties and attending public schools in fifty-two additional school districts, eighteen of which districts have never been made parties to this lawsuit. Conditions were imposed on the districts allowed to intervene which rendered their intervention ineffective.
 
 
 634
 The District Judge followed the pattern of Judge Merhige in the Richmond case whose decision was reversed by the Fourth Circuit in Bradley v. School Board of the City of Richmond, 462 F.2d 1058 (4th Cir. 1972), aff'd by equally divided court, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (Nos. 72-549, 72-550, 1973). 41 U.S.L.W. 4685. The fact that Richmond involved dismantling of a dual system was regarded as unimportant by the District Judge.
 
 
 635
 In an unprecedented opinion, a panel of this Court and now a majority of the en banc Court have upheld findings of the District Court that segregation exists in Detroit and that it cannot be dismantled with a Detroit-only plan of desegregation and the District Court may consider and adopt a metropolitan plan.[1]
 
 
 636
 Just to start such a plan involves the expenditure of about $3,000,000 for the purchase of 295 buses and untold millions of dollars to operate them and for other expenses. It will involve about 780,000 children and, if ordered by the court, will force the busing of black children, against their will and without the consent of their parents, from the inner city of Detroit to one or more of the fifty-three different school districts in four counties, and the white children of these districts will be forcibly bused to the inner city. None of these children have committed any offense for which they should be so punished. It will disrupt the lives of these children and their parents. The metropolitan plan was ill conceived and is a legal monstrosity. However, such a plan will achieve a racial balance or quota in the desegregation area, which is what plaintiffs are seeking.
 
 
 637
 The District Court made no findings that any of the fifty-two school districts outside of Detroit had practiced desegregation tactics against Negro children in their districts or in any other district, or that they were in any wise responsible for the concentration of Negroes or their segregation in Detroit.
 
 
 638
 These fifty-two school districts have been created by the legislature as separate and independent corporate units with power to sue and be sued. They are governed by locally-elected Boards of Education. In each district, the real estate of the people living therein is taxed for the support of their public schools.
 
 
 639
 The school districts were established by neutral legislation when the cities were incorporated. There was not an iota of evidence in the record that the boundaries of the Detroit school district, or any other school district in Michigan, were established for the purpose of creating, maintaining or perpetuating segregation of the races. No such claim was ever made by the plaintiffs.
 
 
 640
 In 1910, long after the districts were created, the black population of Detroit was only 1.2% of the total population of the City. By 1970 it had increased to 43.9% of the total population of 1,511,000. It is obvious that the great influx of blacks, as well as whites, to Detroit was influenced by the favorable industrial climate existing in Michigan and the ability of its industry, principally automotive, to provide jobs.
 
 
 641
 In the school year 1970-1971, there was 285,512 students in the public school system in Detroit of which 168,200 or 63.8% were black and 117,312 or 37.2% were white. The School Board of Detroit ought not to be blamed for the heavy concentration of blacks in the inner City, for housing conditions, or for discrimination by public or private agencies or individuals and ought not to be saddled with the duty to dismantle the concentration. These same conditions exist in other cities throughout the country regardless of the type of school system in effect-whether de jure or de facto. Nor should the adjoining three counties and the fifty-two school districts be penalized because they are located near Detroit.
 
 
 642
 In his book Negroes in Cities, Dr. Karl Taeuber states that residential segregation exists "regardless of the character of local laws and policies and regardless of other forms of discrimination". He said substantially the same thing in his article "Residential Segregation" in the August, 1965 issue of Scientific American.
 
 
 643
 In Bradley v. School Board of City of Richmond, 462 F.2d 1058 (4th Cir. 1972), aff'd by equally divided Court, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (Nos. 72-549, 72-550, (1973), 41 U. S.L.W. 4685, the Court said:
 
 
 644
 "The root causes of the concentration of blacks in the inner city are simply not known. . . ."
 
 And:
 
 645
 "Whatever the basic causes, it has not been school assignments and school assignments cannot reverse that trend."
 
 
 646
 The District Court was motivated in its decision by social considerations. In a pretrial conference on October 4, 1971 the District Court stated:
 
 
 647
 "We need not recite the many serious problems such a plan entails, suffice it to say that a plan of such dimensions can hardly be conceived in a day, to say nothing of the time it will require for implementation. A large metropolitan area such as we have in our case can not be made the subject of instant integration. We must bear in mind that the task we are called upon to perform is a social one, which society has been unable to accomplish. In reality, our courts are called upon, in these school cases, to attain a social goal, through the educational system, by using law as a lever." App. IV, pp. 454, 455.
 
 
 648
 This is incredible!
 
 
 649
 It is submitted that the courts are not called upon to integrate the school system, using law as a lever. Nor should judges assume to act as legislators, for which they are neither fitted nor qualified. It is enough for judges to perform their judicial function and to abide by the separation of powers doctrine provided by our Constitution.
 
 
 650
 The thesis of the panel which wrote the original opinion in this appeal is best stated in its own words in its slip opinion:
 
 
 651
 "This court in considering this record finds it impossible to declare 'clearly erroneous' the District Judge's conclusion that any Detroit only desegregation plan will lead directly to a single segregated Detroit school district overwhelmingly black in all of its schools, surrounded by a ring of suburbs and suburban school districts overwhelmingly white in composition in a State in which the racial composition is 87 per cent white and 13 per cent black. Big city school systems for blacks surrounded by suburban school systems for whites cannot represent equal protection of the law." Slip Opin. p. 65.
 
 
 652
 The majority opinion adopts all of the paragraph except the last sentence which reads as follows:
 
 
 653
 "Big city school systems for blacks surrounded by suburban school systems for whites cannot represent equal protection under the law."
 
 
 654
 In my opinion, the retained part of the paragraph expresses the same thought as the sentence which has been deleted.
 
 
 655
 No decision of the Supreme Court or any other court construing the Constitution supports this thesis and it is not our province to rewrite the Constitution.
 
 
 656
 The majority opinion sharply conflicts with Spencer v. Kugler, 326 F.Supp. 1235 (D.N.J.1971), affirmed, 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972). In Spencer the black students sued the Attorney General of the State of New Jersey, the Commissioner of Education and the State Board of Education alleging that they failed to achieve a racial balance among several districts of a state system of public schools. New Jersey, like Michigan, did not operate a dual system and the alleged imbalance was characterized as de facto segregation.
 
 
 657
 The three-judge Court which heard the case stated:
 
 
 658
 "In none of the schools of which the plaintiffs complain is any black pupil 'segregated' from any white pupil. Indeed, complaint is made that the blacks who reside in the school district served predominate over the whites, thus affording an example of complete desegregation which was the expressed object of the court in the Brown case. 347 U.S. at page 487 of the Opinion at page 688 of 74 S.Ct. in Brown it is stated that:
 
 
 659
 'In each of the cases [from Kansas, South Carolina, Virginia and Delaware] minors of the Negro race, through their legal representatives, seek the aid of the courts in obtaining admission to the public schools of their community on a nonsegregated basis. In each instance, they had been denied admission to schools attended by white children under laws requiring or permitting segregation according to race.'
 
 
 660
 Such is not the basis upon which each of the plaintiffs in the present case seeks relief in this cause. On the contrary plaintiffs would have a substantial portion of the pupils now in attendance in their respective schools ordered by the court removed from these schools and assigned to a school in another district. Alternatively plaintiffs would have the court abolish the respective districts in which their schools are located and assign them to other districts in which the disproportion between white and black students is reduced in one direction or the other. If, as plaintiffs contend, the proportionate black attendance in their respective schools adversely affects the degree of excellence of education which they can receive there must be a point at which any excess of blacks over whites is likely to impair the quality of the education available in that school for the black pupils. Nowhere in the Appendix filed by the plaintiffs or in the facts involved in any of the judicial precedents which they cite are we informed of the specific racial proportions which are likely to assure maximum excellence of the educational advantages available for the whites. Assuming further that efforts to achieve the ideal interracial proportion necessarily include the alteration of the population factor determinative of the redistricting, there can be no assurance that the population factor will remain static. If so, it would be necessary to successively reassign pupils to another district as the rate of births and graduations alters the racial proportions creating the demand for the educational facilities as it changes from term to term. In sum, the difficulty complained of does not amount to unconstitutional segregation." (Id. at 1239-1240).
 
 
 661
 Speaking of school district boundaries, the Court stated:
 
 
 662
 "It is clear that these legislative enactments prescribe school district boundaries in conformity with municipal boundaries. This designation of school district zones is therefore based on the geographic limitations of the various municipalities throughout the State. Nowhere in the drawing of school district lines are considerations of race, creed, color or national origin made. The setting of municipalities as local school districts is a reasonable standard especially in light of the municipal taxing authority. The system as provided by the various legislative enactments is unitary in nature and intent and any purported racial imbalance within a local school district results from an imbalance in the population of that municipality-school district. Racially balanced municipalities are beyond the pale of either judicial or legislative intervention." (Id. at 1240).
 
 
 663
 Spencer is on "all fours" with our case.
 
 
 664
 The majority opinion conflicts with prior decisions of this Court with the unfortunate result that acts which do not violate the Constitution in Cincinnati, are held to be unconstitutional in Detroit.
 
 
 665
 The two decisions with which the majority opinion is in irreconcilable conflict are Deal v. Cincinnati Board of Education, 419 F.2d 1387 (6th Cir. 1969), cert. denied, 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971); Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967), affirming, 244 F.Supp. 572. Twice the Supreme Court was afforded the opportunity to review Deal and as late as 1971 it refused to do so, with only one Justice dissenting.
 
 
 666
 More than eighty-two years ago Ohio, like Michigan, by statute had abolished segregation in the public schools in the State. The neighborhood school system, however, was provided by statute so that schools would be constructed at such places as will be convenient for the attendance of the largest number of children. Ohio Rev.Code Sec. 3313.48. It was not then believed that neighborhood schools were obnoxious. Nevertheless, in Cincinnati the races were imbalanced in the public school system.
 
 
 667
 Some schools were attended entirely by Negroes and others entirely by whites, while others were attended in varying proportions by both white and Negroes. Some Negro schools were racially identified. The segregation was allegedly caused by gerrymandered school-zone lines, by housing discrimination by public and private agencies, by discrimination in job opportunities, and school construction.
 
 
 668
 We held in Deal I that the Board of Education had no constitutional duty to eliminate racial imbalance not caused or created by it, and upheld the neighborhood plan adopted by the State Legislature.
 
 
 669
 The District Judge had excluded evidence of discrimination in the public and private housing markets. We held this ruling was correct on the ground that the discrimination, if it existed, was caused by persons not parties to that case and the Board of Education had no power to rectify that situation. We said: "[If] appellants have any valid claim for [infringing] their rights by public-housing or urban-renewal officials, they may obtain appropriate relief against them under the Fourteenth Amendment. With respect to private actions amounting to discriminatory practices, while there is no federal constitutional right available to appellants, they may seek relief from the state Civil Rights Commission, or in the state courts, if relief is denied under the provisions of the Ohio Fair Housing Law.[2] Deal I, 369 F.2d at 60 fn. 4.
 
 
 670
 The majority opinion also conflicts with Bradley v. School Board of Richmond, supra, and Swann v. Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L. Ed.2d 554 (1971).
 
 
 671
 Swann stated that: "[The] objective is to dismantle the dual school system." Id. at 28, 91 S.Ct. at 1282. Here there has been no dual school system to dismantle. Although not racially balanced, Detroit for many years had achieved a unitary school system in which no student was precluded from attending any school in the district. Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). There are limits as to how far a district court can go. Swann, 402 U.S. at 28, 91 S.Ct. 1267.
 
 Swann also stated:
 
 672
 "If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse." 402 U.S. at p. 24, 91 S.Ct. at p. 1280.
 
 
 673
 The metropolitan plan violates this principle which was applicable only to dual systems. It is even worse when the District Court applies broader orders to a unitary system than have ever been applied to dismantling of a dual system.
 
 
 674
 Swann, is violated by overloading the school system with excess "baggage." Id. at 22, 91 S.Ct. at 1279.
 
 THE DETROIT ONLY PLAN
 
 675
 The finding of the District Court that a Detroit only plan could not accomplish desegregation is not supported by the evidence and are clearly erroneous. The percentage of black and white children in the public schools in 1970-1971 was 63.8% and 37.2% respectively. The racial composition of the state is 87% white and 13% black.
 
 
 676
 In Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L. Ed.2d 51 (1972), the Supreme Court approved a pairing plan for the City and County which had a racial composition of 34% white and 66% black. The existing ratios in Detroit are practically the same.
 
 
 677
 But the District Court in our case was concerned about its own forecast of population trends that the percentage of black students would increase from 63.8% in 1970 to 72% in 1980, and in 1992 would be all black. This forecast is wholly speculative.
 
 
 678
 Such an unsupported and speculative forecast cannot be made the basis for a metropolitan cross-district order. Even if true, which it is not, the Board of Education is not responsible for the population remaining static, or for the mobility of the races. This was made clear in Spencer, supra, id., 326 F.Supp. at 1239, 1240, and also in Swann, supra, id., 402 U.S. at 31, 32, 91 S.Ct. 1267. Nor is the Board required from time to time to adopt plans to meet shifting population trends. Spencer, supra; Swann, supra.
 
 
 679
 Significantly, all that the plaintiffs are complaining about is the operation of the Detroit school system and the failure of the State defendants to properly supervise, control or finance it. Plaintiffs cannot complain about school district lines because those lines were neutrally drawn with the incorporation of the cities long before the Negroes had migrated north in large numbers. If school-zone lines in Detroit have not been properly drawn or if there are imbalances of black and white students, or imbalances on faculty or staffs in the Detroit schools, or if school buildings have been improperly located, or if plaintiffs have been discriminated against in any other respect, these inequities can all be remedied in the Detroit school system without forcibly moving Negroes and whites against their will across district lines into other counties and districts. An order requiring the adoption of a metropolitan plan under the facts of this case, merely to dismantle the concentration of blacks in the inner city, violates constitutional rights of both races and constitutes a flagrant abuse of judicial power.[3] Swann recognized a limitation on the power of District Judges. Id., 402 U.S. at 28, 91 S.Ct. 1267. Chief Justice Vinson, in writing the opinion for the court in Oyama v. California, 332 U.S. 633, 646, 68 S.Ct. 269, 275, 92 L.Ed. 249 (1948), stated:
 
 
 680
 "But assuming, for [the] purposes of argument only, that the basic prohibition is constitutional, it does not follow that there is no constitutional limit to the means which may be used to enforce it."
 
 
 681
 Thus, the District Court may not enter orders in school desegregation cases which impinge upon and violate the constitution rights of other persons.
 
 
 682
 Many Negroes as well as whites are opposed to integration of the races in the public school system by enforced busing.[4] A busing order directed at "benefiting" black students in Detroit (by distributing the black student population throughout the entire metropolitan area) produces a head-on clash of constitutional principles. Blacks are given an (alleged) benefit when other citizens "similarly situated", i. e., other minority-group students and even inner-city white students, are not given such benefits but are discriminated against. This result, of course, is a classic denial of the equal protection of the laws. Barbier v. Connolly, 113 U.S. 27, 32, 5 S.Ct. 357, 28 L.Ed. 923 (1885); Truax v. Corrigan, 257 U.S. 312, 333, 42 S.Ct. 124, 66 L.Ed. 254 (1921).
 
 
 683
 In a very recent thought-provoking article, appended hereto as Appendix A and entitled "Reverse Discrimination", Dr. Morton Teicher, Dean of the School of Social Science of the University of North Carolina, discussed the problems of deprived groups and remedies for past discrimination including quota systems. Since opinions of sociologists were relied upon in Brown I, it is important that they not be overlooked here. See also the discussion entitled "Busing: A Review of 'The Evidence"', The Public Interest No. 30 Winter 1973; "The Evidence on Busing," The Public Interest No. 28 Summer 1972; Ross, "Why Quotas Won't Work," Reader's Digest, Feb. 1973, p. 51.
 
 
 684
 The District Court's metropolitan cross-district order, an order purportedly directed at furthering the purposes of the equal protection clause, itself clashes with this constitutional principle.
 
 
 685
 The metropolitan busing remedy ordered by the Court is, however, unconstitutional on a more fundamental level. It invalidly assumes that the equal protection clause of the Fourteenth Amendment protects groups and not individuals. The entire thrust of the District Court's order is that the rights of blacks as a group must be redressed and that, in the process, the rights of individual black children (and non-black children) may be disregarded.
 
 
 686
 Consider the burden on the individual students who are bused in order to achieve a "racial balance" throughout the entire Detroit Metropolitan Area. Individual black and white students who formerly walked to a nearby school would be forced to travel substantial distances to other schools. These are not individuals who are burdened because their parents have chosen to reside far from the nearest school in the district or because they have special educational needs attended to in but a single school in the district. These are individual children who are burdened with being bused solely because they are black or white, as the case may be.
 
 
 687
 Parenthetically, it should be noted that if there were any question that busing involves a substantial burden on the individual who cannot attend his neighborhood school, that question has been dispelled by the urgings of desegregation-case plaintiffs that black children can not be "unequally burdened" by being the only students bused, the white students being permitted to attend their neighborhood schools. See e. g., Haney v. County Bd. of Education of Sevier Co., 429 F.2d 364, 371-372 (8th Cir. 1970); Brice v. Landis, 314 F.Supp. 974, 978-979 (N.D.Calif.1969).
 
 
 688
 Yet in proposing a remedy for black students as a group based on a head count, the District Court entirely disregards these individual black and white students and their right not to be burdened solely on account of their race.
 
 
 689
 The equal protection clause of the Fourteenth Amendment states:
 
 
 690
 ". . . nor shall any state . . . deny to any person within its jurisdiction the equal protection of the laws." (Emphasis added.)
 
 
 691
 The Supreme Court has recognized the individual nature of the equal protection clause on a number of occasions.[5] In Shelley v. Kraemer, 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161 (1948), the Court was explicit:
 
 
 692
 "The rights created by the first section of the Fourteenth Amendment [the equal protection clause] are, by its terms, guaranteed to the individual. The rights established are personal rights. [Court's n. 29.] McCabe v. Atchison, Topeka & Santa Fe R. Co., 235 U.S. 151, 161-162, 35 S.Ct. 69, 59 L.Ed. 169 (1914); Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S. Ct. 232, 83 L.Ed. 208 (1938); Oyama v. California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948)."
 
 
 693
 It simply defies logic to have a "constitutionally required" remedy for a group of individuals which, in turn, unconstitutionally denies equal protection to the individuals in the group as well as individuals in other groups, and which remedy unconstitutionally imposes burdens on students within and without the group solely because of their race. Yet this is precisely what the District Court has held. The Court states (correctly) that discrimination against the black race in Detroit must be remedied, but then orders massive interdistrict busing of students to achieve racial balances, denying individual blacks (and nonblacks) their right not to be substantially burdened solely on account of their race.
 
 
 694
 But the fundamental error of the District Court order was in treating the Michigan school system as a dual system when it was not, and in proposing the dismantling of concentration of blacks in Detroit and distributing them in fiftytwo other school districts in three other counties. Virtually all of the cases relied upon by the plaintiffs to support the District Court's rulings involved dual school systems.
 
 
 695
 DUE PROCESS VIOLATIONS OF FIFTH AND FOURTEENTH AMENDMENTS TO
 
 THE CONSTITUTION
 
 696
 Although, as stated by the majority, this is the fourth time that the case has been before us, the District Court has not as yet adopted any specific plan for desegregation; instead the District Court has entered a number of interlocutory orders some of which are now before us for review under 28 U.S.C. Sec. 1292(b). These include rulings on the issue of Segregation, findings of fact and conclusions of law on Detroit Only Plan of Desegregation, propriety of a Metropolitan remedy to desegregate Detroit Schools, Desegregation Area, and Order directing Michigan State officials to purchase 295 school buses.
 
 
 697
 This procedure is unprecedented. Usually school desegregation cases are reviewed on appeal only after a plan of desegregation has been adopted. It appears to us that the District Court has placed the cart before the horse. It has entered a number of far-reaching piecemeal interlocutory orders from which no appeal could be taken without the court's permission, and which would bring about a fait accompli of a metropolitan plan without affording the defendants their right of appeal. This was in the absence of necessary and indispensable parties and to the prejudice of intervening school districts which had been denied effective participation in the proceedings.
 
 
 698
 The Complaint, which has never been amended, sought only the desegregation of the Detroit school system. There was no allegation that any other school district would be affected. As soon as it was determined that other school districts might be adversely affected, the District Court should have required the plaintiffs to make them parties defendant with a full opportunity to be heard on the merits of the case. These school districts were necessary and indispensable parties. This is the correct procedure, and was followed in Bradley v. School Board of the City of Richmond, 338 F.Supp. 67 (E.D.Va.1971), reversed on other grounds, 462 F.2d 1058 (4th Cir. 1972), aff'd by equally divided Court, 412 U.S. 92, 93 S.Ct. 1952, 36 L. Ed.2d 771 (Nos. 72-549, 72-550, 1973), 41 U.S.L.W. 4685.
 
 
 699
 All school districts whose borders were being invaded were entitled, as a matter of right and not of mere grace, to be made parties defendant in the case and to be accorded the same rights as any other defendants. They were entitled to be heard on all issues in the case which affected them, and were entitled to participate effectively in the proceedings. They were entitled to be heard on the issues of segregation, the "Detroit-Only plan" and the "Metropolitan plan". They had the right to offer evidence and endeavor to prove that there was no causal connection between any act or omission of the Detroit Board of Education (or of the State) and the concentration of blacks in the inner City, and that whatever constitutional violations of the rights of the plaintiffs may have occurred, such violations could be remedied within the Detroit school district without invading other districts which were not in any manner responsible for conditions in Detroit. These rights were denied to the intervenors.
 
 
 700
 While the orders of the District Court on these three issues were interlocutory, the judgment entered by the majority is final and the issues may not be relitigated on remand. Thus judgment has been entered against the absent school districts as well as those allowed to intervene, in violation of their due process rights to a fair and impartial trial. The orders affirmed are far reaching; they will require the expenditure of untold millions, and will disrupt the lives of hundreds of thousands of children and their parents.
 
 
 701
 However, in its opinion the majority did provide for amendment of pleadings on remand, making new party defendants, for intervention, and for offering additional testimony. These provisions are wholly illusory with respect to the issues of segregation, the "Detroit-Only plan" and the "Metropolitan plan", as the opinion expressly excludes these issues from reconsideration upon the remand. The only remedy available to the intervening school districts is to petition the Supreme Court for certiorari. The eighteen school districts, as well as any additional school districts which the District Court may add to the desegregation area upon the remand, are without any remedy. Since they have never been made parties, they may not petition the Supreme Court for a writ of certiorari. They have surely been deprived of their property rights, not only without due process of law, but without any process of law.
 
 
 702
 The majority opinion, with its disapproval of the "Detroit-Only" plan and its order to the District Court to consider and adopt a so-called "Metropolitan" plan invading the borders of three counties and the boundaries of fifty-two school districts, completely destroys local control of the public school system along with all of its advantages. Local control is a traditional concept of the American public school system. Its merit and value were recognized by the Supreme Court in two very recent decisions. San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (decided March 21, 1973); and Wright v. Council of the City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972).
 
 
 703
 In San Antonio Independent School District, supra, Mr. Justice Powell, wrote the opinion for the Court, cited and quoted from opinions of Chief Justice Burger and Justice Potter Stewart in Wright, stating:
 
 
 704
 "The Texas system of school finance is responsive to these two forces. While assuring a basic education for every child in the State, it permits and encourages a large measure of participation in and control of each district's schools at the local level. In an era that has witnessed a consistent trend toward centralization of the functions of government, local sharing of responsibility for public education has survived. The merit of local control was recognized last Term in both the majority and dissenting opinions in Wright v. Council of the City of Emporia, 407 U.S. 451, 92 S. Ct. 2196, 33 L.Ed.2d 51 (1972). Mr. Justice Stewart stated there that '[d]irect control over decisions vitally affecting the education of one's children is a need that is strongly felt in our society.' Id., at 469, 92 S.Ct. 2196. The Chief Justice, in his dissent, agreed that '[l]ocal control is not only vital to continued public support of the schools, but it is of overriding importance from an educational standpoint as well.' Id., at 478, 92 S. Ct. at 2211.
 
 
 705
 "The persistence of attachment to government at the lowest level where education is concerned reflects the depth of commitment of its supporters. In part, local control means, as Professor Coleman suggests, the freedom to devote more money to the education of one's children. Equally important, however, is the opportunity it offers for participation in the decision-making process that determines how those local tax dollars will be spent. Each locality is free to tailor local programs to local needs. Pluralism also affords some opportunity for experimentation, innovation, and a healthy competition for educational excellence. An analogy to the Nation-State relationship in our federal system seems uniquely appropriate. Mr. Justice Brandeis identified as one of the peculiar strengths of our form of government each State's freedom to 'serve as a laboratory . . . and try novel social and economic experiments.' No area of social concern stands to profit more from a multiplicity of viewpoints and from a diversity of approaches than does public education." (411 U.S. at 49, 93 S.Ct. at 1305.)
 
 
 706
 As we have pointed out, the facts of the present case furnish no basis whatsoever for the Court to destroy local control of our public school system.
 
 
 707
 Unreasonable and intolerable conditions, however, were imposed by the Court on the intervention by the school districts.[6] The school districts filed objections to the conditions which were never ruled on by the Court. These conditions alone constituted a denial of due process to the intervenors who were precluded from raising questions necessary for their own protection and who were denied the right to be heard fully on the merits of the case.
 
 
 708
 The type of intervention permitted by the District Court is graphically illustrated in the brief filed by counsel for the intervenors in which he complains about the following incidents with citation of supporting record references:
 
 
 709
 "Seven days after allowing appellants to intervene, as a matter of right but subject to oppressive conditions, the trial court required the filing of written briefs on the legal propriety of a metropolitan plan of desegregation. (A. Ia397) The court did not require or permit oral argument. Less than 36 hours later the court issued its 'Ruling on Propriety of Considering a Metropolitan Remedy to Accomplish Desegregation of the Public Schools of the City of Detroit' (A. Ia439) rejecting the contentions of Intervenor School Districts. Testimony regarding metropolitan plans commenced four days later (a weekend and Motion day falling between) at 10:10 A.M. Prior to the noon recess, just two hours after Intervenor School District counsel had first appeared in the District Court and before completion of testimony of a single witness, the District Judge announced that counsel could stop by his office and pick up his 'Findings of Fact and Conclusions of Law on Detroit-only Plans of Desegregation' (A. Ia456) wherein the court announced its intention to seek a more desirable racial mix by means of a Metropolitan Plan.
 
 
 710
 Thus without any opportunity for oral argument, without opportunity to examine or cross-examine one witness, without opportunity to present one shred of evidence, and indeed, without opportunity to obtain copies of previous pleadings and testimony (let alone read same), the Intervenor School Districts had been effectively foreclosed from protecting their interests. ."
 
 
 711
 He further complains about the fact that the Court permitted him to take the deposition of Dr. David Armor, a sociologist of Harvard University, and then refused to receive it in evidence.
 
 
 712
 Dr. Armor was a well-qualified expert. He had previously written an article entitled "The Evidence on Busing" published in The Public Interest No. 28, Summer 1972, which exploded some of the existing theories on educational achievement resulting from busing.
 
 
 713
 In a subsequent article by Dr. Thomas F. Pettigrew and associates, they responded to Dr. Armor's article on busing and quoted from Judge Roth's ruling excluding his deposition as follows:
 
 
 714
 "This fundamental fact was dramatically demonstrated by the judicial reaction to Armor's deposition in the Detroit school case, a deposition based on an earlier draft of 'The Evidence on Busing.' On June 12, 1972, U.S. District Court Judge Stephen H. Roth ruled the deposition inadmissible as evidence on the grounds of irrelevancy. The deposition, in Judge Roth's view, represented 'a new rationale for a return to the discredited "separate but equal policy . . . ."'[7] The Public Interest No. 30, Winter 1973.
 
 
 715
 In an article entitled "The Double Double Standard" appearing in the same issue at page 119, Dr. Armor replied to the Pettigrew article stating among other things:
 
 
 716
 "The double standard here is obvious. One willingly applies social science findings to public policy if they are in accordance with one's values, but declares them irrelevant if they contradict one's values. . . ." Id. at 130.
 
 
 717
 The Supreme Court in Brown I relied heavily on testimony of sociologists as to the adverse effect of segregation on the educational achievement of Negro children. It is inconceivable that the District Court would hold contrary testimony of a sociologist irrelevant and exclude it. This was prejudicial error. In a court of justice not merely one side but both sides are entitled to offer evidence.
 
 
 718
 The District Court quashed a subpoena duces tecum issued by the intervenors for Charles Wells, an employee of the Detroit Board of Education, to bring with him "all records of the past two (2) years concerning incidents involving damage to property, safety of pupils or staff (whether perpetrated by other pupils, staff or outsiders) criminal activities, or fires in or on school property as regards each school in the Detroit public school system."
 
 
 719
 Although the Court had previously received the testimony of Freeman Flynn, offered by plaintiffs on the subject of safety, it denied permission to the Intervenors to offer evidence on the same subject by quashing the subpoena. The Court was not that technical in admitting into evidence Exhibit 16, although it was not properly identified, stating that the Court decided to follow Justice of the Peace Cane's rule: "We will let it in for what it is worth." Indeed, he did, but did not apply Justice Cane's rule to the deposition.
 
 
 720
 Due process required an opportunity to be heard which must be granted at a meaningful time and in a meaningful manner. Jenkins v. McKeithen, 395 U. S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); In Re Gault, 387 U.S. 1, 19-21, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); In Re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948).
 
 
 721
 As well stated in Railroad Commission of California v. Pacific Gas & Electric Co., 302 U.S. 388, 393, 58 S.Ct. 334, 338, 82 L.Ed. 319 (1938):
 
 
 722
 "The right to a fair and open hearing is one of the rudiments of fair play assured to every litigant by the Federal Constitution as a minimal requirement. Ohio Bell Telephone Co. v. Public Utilities Comm'n, 301 U.S. 292, 304, 305."
 
 
 723
 The intervenors were entitled to the effective assistance of counsel, to have a reasonable time to examine the papers in the case and to prepare for trial, and to offer evidence in support of their contentions before the case is decided against them.
 
 
 724
 One other matter is worthy of comment. The District Court appointed a nine-member panel to set up a metropolitan plan of desegregation. Three members of the panel were from Detroit. Only one member was appointed to represent the fifty-two school districts whose school population exceeds that of Detroit by more than two times. This is a plain example of unfairness.
 
 
 725
 The Detroit Board of Education, although vigorously denying the commission of any purposeful segregative acts committed against Negroes and contending that plaintiffs have not proven their case, has taken an unusual and extraordinary position. It supports the plaintiffs on the issue of a metropolitan plan contending that if a constitutional violation has been shown, only such a drastic remedy will rectify it. It is obvious that the Detroit Board was motivated by its concern that a 63.8%-black and a 37.2%-white quota was too heavily weighted with black pupils, and that it owed a constitutional duty to dilute that quota and to distribute the black-pupil population of Detroit into the other three counties and fifty-two additional school districts, in order to effectuate a quota of about 25%-black and 75%-white children in each school.
 
 
 726
 It is submitted that no such constitutional duty exists and that the District Court erred in ordering it; Swann, supra.THE ELEVENTH AMENDMENT TO THE CONSTITUTION PROSCRIBES
 
 
 727
 SUITS AGAINST THE STATE OF MICHIGAN, AND IT HAS
 
 SOVEREIGN IMMUNITY
 
 728
 The plaintiffs have attempted to sue the State of Michigan by making the Governor, the Attorney General, and the Acting Superintendent of Schools parties defendant. Later, when the District Court issued an order prior to the adoption of any plan for desegregation, to purchase 295 buses, it made the Treasurer of the State a party defendant in order to sequester funds in his hands.
 
 
 729
 It was the theory of the plaintiffs that under the doctrine of vicarious liability the state was liable for the acts and conduct of the Detroit Board of Education and of other political subdivisions, and that since the State is a party defendant it really was not necessary to make the Detroit School Board, or the school boards in the other districts, parties to the case. This theory has no legal support and is unsound. Each school district is a separate and independent corporate unit with power to sue and to be sued, and has separate taxpayers whose property is taxed for the support of the schools as well as for the payment of the district's bond issues.
 
 
 730
 If, as plaintiffs contend, the State has been made a party defendant, then such an action against the State is proscribed by the Eleventh Amendment.
 
 
 731
 The most recent decision of the Supreme Court upholding sovereign immunity of a state is Krause v. State of Ohio, 409 U.S. 1052, 93 S.Ct. 557, 34 L. Ed.2d 506 (1972).
 
 
 732
 To the same effect is Ex Parte State of New York, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921), where the court made it clear that the applicability of the Eleventh Amendment "is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding as it appears from the entire record." Id. at 500, 41 S.Ct. at 590.
 
 
 733
 The general rule was stated in Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), as follows:
 
 
 734
 "The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain or interfere with the public administration,' Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947), or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.' Larson v. Domestic & Foreign Corp., supra, 337 U.S. 682 at 704, 69 S.Ct. 1457, 93 L. Ed. 1628; Ex parte New York, 256 U.S. 490, 502, 41 S.Ct. 588, 65 L.Ed. 1057 (1921)."
 
 
 735
 The Civil Rights Act has not yet been construed as an exception to the Eleventh Amendment.
 
 
 736
 The order issued against the State defendants provided:
 
 
 737
 "1. The Defendant Detroit Board of Education shall acquire by purchase, lease or other contractual arrangement at least 295 buses for use in the interim desegregation plan during the 1972-73 school year. All financial obligations incurred as the result of this Order shall be the sole financial obligation of the State Defendants, including the added State Defendant State Treasurer Allison Green, as set forth below in Paragraph 2. Said order, lease, or other contract shall be entered into by negotiation and without the necessity for bids forthwith and in no event later than Thursday, July 13, 1972.
 
 
 738
 2. The State Defendants shall bear the cost of this acquisition and State Defendants, including the added State Defendant Green, shall take all necessary steps utilizing existing funds and sources of revenue, to be acquired State funds, legislatively authorized and funds directed by the State Constitution to the State School Aid Funds and by re-allocation of existing or new funds to pay for said transportation acquisition either directly or through the Defendant Detroit Board." App. at 576, 577.
 
 
 739
 This order imposed a personal liability on the State defendants and would require them, if they complied with it, to misappropriate and misapply State funds in violation of state law. If they did not comply with it they could be punished for contempt.
 
 
 740
 In addition, the State defendants were ordered to pay the cost of the nine-member panel appointed by the Court to devise the Metropolitan Plan, (1 Ba 538). This cost was estimated at $22,500. All defendants were ordered to hire black counsellors and provide in-service training for teachers in the fifty-three school district desegregation area. The initial cost of the in-training was about $3,000,000.
 
 
 741
 The District Court was without authority to impose a personal liability on the State defendants or to order them to misapply and misappropriate State funds in violation of State law.[8]
 
 
 742
 The legislature of Michigan is not likely to act on the suggestion of the majority, accompanied by a veiled threat if it fails to so act, that it change school district boundary lines to benefit a few at the expense of many, and thereby violate the constitutional rights of many. School district lines may not be changed for an unconstitutional purpose. United States v. Scotland Neck City Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972); Wright v. Council of the City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). Since an adequate remedy already exists within the Detroit school district to correct any constitutional violation therein, there is no occasion for the legislature to alter the existing neutral, non-discriminatory school district boundaries.
 
 RELIEF
 
 743
 Because of prejudicial errors of constitutional magnitude committed by the District Court, each of the orders from which an appeal has been taken should be reversed and a new trial granted with instructions to consider and adopt a Detroit-only desegregation plan to remedy any constitutional violations which it may find to exist in said City.
 
 
 744
 The Governor, the Attorney General and the Treasurer of the State should be dismissed, as they are unnecessary parties to a determination of the issues of the case.
 
 APPENDIX A
 REVERSE DISCRIMINATION
 
 745
 The development of "affirmative action" programs for minority groups is posing some intractable problems. These problems arise from the existence of conflicting, fundamentally incompatible values. On the one hand, we social workers value righting the wrongs perpetrated for too long on minority groups. On the other hand, we value the right of all persons to be treated equally.
 
 
 746
 Distributive justice requires the dissemination of benefits to all without depriving any individual or group of something it values. This is far more in keeping with fairness and equity than the idea of redistributive justice, which confers benefits on one group at the expense of others. Redistributive justice, then, leads to reverse discrimination.
 
 
 747
 Redistributive justice is advocated to atone for our failure to live up to the belief in the capacity and the dignity of each human being. This failure does not negate the soundness of that belief. Rather, it should spur us to correct the failure-not the belief. When practices fail to reflect principles, then we should change our practices, not our principles.
 
 
 748
 For social workers, the issue has come to the forefront in agency and university hiring practices and admissions policies of schools of social work. Social agencies, especially those serving ghetto populations, are giving preference to minority group members in employment. Universities, beset by pressures from the U.S. Department of Health, Education, and Welfare, are similarly giving preference to women and minority groups. Some schools of social work have adopted quota systems in dealing with candidates for admission.
 
 
 749
 These practices conflict with the fundamental social work belief in individual human dignity and the libertarian belief that each person is entitled to be judged and valued as an individual. Quota systems and preferential treatment are artificial restrictions on this right because they substitute irrelevant group characteristics such as race or religion for consideration of an individual's capacity and potential. Respect for the individual is a basic part of social work's credo and commitment. We cannot reconcile this conviction with treating people only as representatives of a racial group.
 
 
 750
 When we try to eliminate discrimination and compensate for past wrongs by quota systems, we substitute one injustice for another. We deny the inherent equality of all people and undermine the proposition that each individual should have the same opportunity to achieve and to be judged according to his merits. We pit group against group and destroy the possibility of harmonious interaction. Quotas are pernicious instruments; they represent an unacceptable means for achieving a desirable end. "Preferential quotas are condescending, divisive and detrimental to the integrity of a university."[1]
 
 
 751
 A quota system institutionalizes discrimination and must be vigorously opposed. Ultimately, it is a form of segregation. The progressive democratization of the university through the elimination of any criterion for admission other than merit has been one of the success stories of America. Now some of the benighted beneficiaries of that victory ally themselves with those antilibertarian forces that would have blocked their own access to education. They are ready to eradicate the victory of equal opportunity over discriminatory quotas, for which their forebears fought so hard. That victory has only been partially won. We cannot falter now by substituting a host of irrelevant and inappropriate considerations for merit. The test a university must apply to each candidate is merit-not inherited status.
 
 
 752
 Some advocates of quota systems believe that quotas will redress wrongs and thus produce equal opportunity, when actually they eliminate equal opportunity. Quotas have historically been used for exclusion. They were an insidious manifestation of institutionalized bigotry, covertly designed to exclude unwanted groups. They were wrong in the past and they are wrong now, even though they are now designed to achieve inclusion, rather than exclusion. Discriminatory practices are wrong, no matter what their intent. Whether they are for or against particular groups, quota systems are morally indefensible.
 
 
 753
 For social workers, the distinctions among people based on race, ethnic background, religion, or creed that inhere in quota systems are particularly abhorrent. Our regard for the individual and our objection to hereditary caste as a status determinant should make quota systems especially impossible for us to accept.
 
 
 754
 For schools of social work, the argument that quotas for admission will produce student bodies that represent the proportion of racial, ethnic, or religious groups in society is a curious expression of bigotry. Proportional representation on a group basis is highly discriminatory. What taxonomy shall be used to categorize the groups that should be represented? Among the characteristics that defy classification are the following: cultural, economic, ethnic, gender, geographic, linguistic, national, occupational, racial, religious, social class, and tribal.
 
 
 755
 Some minority groups include the following: the aged, American Indians, Asian-Americans, Blacks, capitalists, Catholics, Chicanos, easterners, factory workers, farmers, German-Americans, Hispanic Americans, Hungarian-Americans, immigrants, Irish-Americans, Italian-Americans, Jews, the lower class, migrants, nomads, northerners, Polish-Americans, the poor, Puerto Ricans, slum-dwellers, southerners, Swedish-Americans, the upper class, wasps, westerners, and youths.
 
 
 756
 Who is not a member of a minority group? Who cannot find a place among this woefully incomplete list of minorities?
 
 
 757
 We are all minorities. Each of us comes from a distinctive racial, religious, or ethnic stock. Each of us is a newcomer or a descendant of newcomers. Even the native Americans-the Indians -came to North America from across the Bering Straits 25,000 years ago. Each of us has ties to our own roots. Each of us has pride in our origins. Each minority contributes to America- to its building, its evolution, and its maintenance.
 
 
 758
 (Morton Teicher)
 
 
 759
 Morton Teicher, Ph.D., is Dean, School of Social Work, University of North Carolina, Chapel Hill, North Carolina.
 
 
 760
 KENT, Circuit Judge (concurring in part and dissenting in part):
 
 
 761
 While I cannot concur in the majority opinion in these cases I am in accord with certain of the conclusions announced in that opinion.
 
 
 762
 To narrow the scope of this dissent it should be stated at the outset that I am in complete agreement with the majority's conclusion that on the record as presented and because of the concessions made by counsel for the School District of the City of Detroit during oral argument it appears without question that the Detroit city schools were unconstitutionally segregated and that an order for integration of those schools must be fashioned by the District Court. I am further in accord with the conclusion of the majority that the District Court's order for the purchase of buses for use in effectuating a plan of integration covering the metropolitan Detroit area is premature and must be stayed until an appropriate plan has been approved by the District Court. I agree that each of the suburban school districts which may be affected by any proposed metropolitan plan is a necessary party to the litigation within the meaning of Rule 19, Federal Rules of Civil Procedure, as found by the majority and that the pleadings must be amended to join such school districts and bring all parties before the Court.
 
 
 763
 It is at this point that I separate from the majority and find myself compelled to state the reasons why I cannot join in the majority opinion. The majority opinion approves the District Court's conclusion that a Detroit only integration plan would be insufficient to cure the unconstitutional segregation found to have been imposed in the Detroit city schools. Those who join in such a conclusion appear to me to have a misapprehension of the record in this case.
 
 
 764
 As stated by the Court in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, at page 22, 91 S.Ct. 1267, at page 1278, 28 L.Ed.2d 554 (1971):
 
 
 765
 "The constant theme and thrust of every holding from Brown I to date is that state-enforced separation of races in public schools is discrimination that violates the Equal Protection Clause. The remedy commanded was to dismantle dual school systems."
 
 
 766
 The "state-enforced separation of races" to which reference is made in the quoted material was not found to exist in the metropolitan Detroit area. While the District Judge made comments about the segregation of the races with reference to the situation existing within the City of Detroit as related to at least some of the suburban communities within the counties of Wayne, Oakland and Macomb, which comments have been quoted with approval and adopted by the majority of this Court, we cannot escape the conclusion of the District Judge, as stated in his formal opinion, 345 F. Supp. 914, at page 920 (E.D.Mich.1972), where the Court said:
 
 
 767
 "It should be noted that the court has taken no proofs with respect to the establishment of the boundaries of the 86 public school districts in the counties of Wayne, Oakland and Macomb, nor on the issue of whether, with the exclusion of the city of Detroit school district, such school districts have committed acts of de jure segregation."
 
 
 768
 With such a statement in the record it is beyond the comprehension of this writer to understand how the majority can approve the conclusion of the District Court which requires that at least some of the 86 public school districts outside the City of Detroit should be embraced within a metropolitan school district for the purpose of desegregating the Detroit city schools, the only district which has been found from the evidence to have "committed acts of de jure segregation." Without proof with regard to segregatory activities within the other school districts or in regard to district boundaries any conclusion by the District Court or by this Court that school district boundaries of other districts had the effect of maintaining or creating unconstitutionally segregated schools within the City of Detroit is obviously based on irrelevant, unsubstantial evidence or totally unsupported assumptions.
 
 
 769
 I am in accord with the application of the statement of the Court of Appeals for the Fifth Circuit (though not in the limitation to specific schools) in United States v. Texas Education Agency, 467 F.2d 848, at page 883 (5th Cir. 1972), en banc, where the majority opinion quoted the statement in Swann that "the nature of the violation determines the scope of the remedy," and then proceeded to conclude at page 884:
 
 
 770
 "The power of the district court will depend first upon a finding of the proscribed discrimination in the school system. Swann, 402 U.S. at 16, 91 S. Ct. 1267, 28 L.Ed.2d 554. In determining the fact of discrimination vel non, whether imposed by statute or as a result of official action, the district court must identify the school or schools which are segregated as a result of such discrimination. This identification must be supported by findings of fact. The importance of such a determination will be seen in some populous school districts embracing large geographical areas. There may be segregated schools which are the result of unconstitutional statutes or of official action. There may be other one race schools which are the product of neutral, non-discriminatory forces."
 
 
 771
 If we accept the premise that "the nature of the violation determines the scope of the remedy," as announced by the United States Supreme Court, then, clearly, the remedy proposed by the District Court, and approved by a majority of this Court, goes far beyond the "nature of the violation" since the District Court has already stated as a conclusion that no evidence was taken as to any violation with regard to any suburban school district.
 
 
 772
 While the minority in the Texas Education Agency case disapproved of the suggestion of the majority that specific schools within a system must be found to have been segregated, and treated separately, (476 F.2d 888 where the minority speaks through Judge Wisdom), yet the minority does not find nor even suggest that it would be appropriate to expand the order for relief beyond the system found to have committed acts which violated the constitutional rights of the plaintiffs in the action.
 
 
 773
 Through the majority's opinion runs the thread which holds it together. That thread is the unwillingness apparent in the minds of the majority to sanction a black school district within a city which it concludes will be surrounded by white suburbs. While the majority does not now state that such a demographic pattern is inherently unconstitutional, nevertheless, I am persuaded that those who subscribe to the majority opinion are convinced, as stated in the slip opinion of the original panel, "big city school systems for blacks surrounded by suburban school systems for whites cannot represent equal protection of the law." While that statement has been removed from the opinion of the majority, yet the premise upon which the statement was obviously based must necessarily form the foundation for the conclusions reached in the majority opinion. It may be that such will become the law, but such a conclusion should not receive our approval on a record such as exists in this case.
 
 
 774
 As has been pointed out in the other opinions, the boundaries of the school district of the City of Detroit have been co-terminus with the boundaries of the City of Detroit for more than 100 years. Those lines were laid out at a time when there was a minimal black population in the metropolitan area of Detroit, if there was such metropolitan area at the time the boundary lines were established.
 
 
 775
 The District Judge and the majority make much of the fact that "if the boundary lines of the school districts of the City of Detroit and the surrounding suburbs were drawn today few would doubt that they could not withstand constitutional challenge." This interesting statement provides a fertile field for speculation but certainly has no validity. A proposal to adopt an amendment to the Constitution of the United States in the same manner and with the same people voting as adopted the Constitution of the United States would be stricken immediately. I know of no one who would suggest that because of changes in the methods of electing the membership of state legislatures that the Constitution of the United States thereby becomes unconstitutional. The quoted statement is to me a complete non sequitur.
 
 
 776
 I know of no authority which would permit a Court to announce a conclusion, based upon a violation of the Constitution, absent the taking of proofs to establish such constitutional violation, which proofs the District Judge stated he did not take in this case.
 
 
 777
 Absent proofs, which clearly were not taken, to establish a violation of the constitutional rights of these plaintiffs by the suburban school district personnel and by the State of Michigan in laying out suburban school district lines it would appear that we are in complete and absolute conflict with the prior decisions of this Court. In Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966), cert. denied 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967) (Deal I), this Court rejected the contention that the state had an affirmative obligation to balance schools racially (in that case within the City of Cincinnati) "to counteract the variety of private pressures that now operate to restrict the range of choices presented to each school child." 369 F.2d at 59.
 
 
 778
 Deal I was cited with approval by this Court in Davis v. School District of City of Pontiac, 443 F.2d 573 (6th Cir. 1971), cert. denied 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971). The Court said at page 575:
 
 
 779
 "Appellants correctly contend that under Deal v. Cincinnati Bd. of Educ., 369 F.2d 55 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L. Ed.2d 114 (1967), a school district has no affirmative obligation to achieve a balance of the races in the schools when the existing imbalance is not attributable to school policies or practices and is the result of housing patterns and other forces over which the school administration had no control."
 
 
 780
 The majority, while refusing to overrule Deal I and Davis, creates without evidence an obligation to achieve a balance of the races in schools not in a school district but in a metropolitan area, and does so while denying to the vast majority of the school districts involved in such metropolitan area the opportunity to offer evidence to establish that they had not been used for or guilty of any segregative practices. Many other appellate courts have agreed with Deal and Davis. Downs v. Board of Education of Kansas City, 336 F.2d 988, 998 (10th Cir. 1964):
 
 
 781
 "Appellants also contend that even though the Board may not be pursuing a policy of intentional segregation, there is still segregation in fact in the school system and under the principles of Brown v. Board of Education, supra, the Board has a positive and affirmative duty to eliminate segregation in fact as well as segregation by intention. While there seems to be authority to support that contention, the better rule is that although the Fourteenth Amendment prohibits segregation, it does not command integration of the races in the public schools and Negro children have no constitutional right to have white children attend school with them."
 
 
 782
 Keyes v. School District No. 1, Denver, Colorado, 445 F.2d 990, 1005 (10th Cir. 1971), cert. granted 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728 (1972):
 
 
 783
 "Our reluctance to embark on such a course stems not from a desire to ignore a very serious educational and social ill, but from the firm conviction that we are without power to do so. Downs v. Board of Education, 336 F. 2d at 998. Before the power of the federal courts may be invoked in this kind of case, a constitutional deprivation must be shown. Brown v. Board of Education, 347 U.S. 483, 493-495, 74 S.Ct. 686, 98 L.Ed. 873 (1954) held that when a state segregates children in public schools solely on the basis of race, the Fourteenth Amendment rights of the segregated children are violated. We never construed Brown to prohibit racially imbalanced schools provided they are established and maintained on racially neutral criteria, and neither have other circuits considering the issue. Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966); 419 F.2d 1387 (1969); Springfield School Committee v. Barksdale, 348 F.2d 261 (1st Cir. 1965); Bell v. School City of Gary, Indiana, 324 F.2d 209 (7th Cir. 1963)."
 
 
 784
 United States v. Board of School Commissioners of City of Indianapolis, Indiana, 474 F.2d 81, 83, 84 (7th Cir. 1973):
 
 
 785
 "Appellants first assert that there is no constitutional duty to remedy the effects of racial imbalance or to maintain any particular racial balance in the public schools. The Government does not quarrel with this assertion, and, indeed, insofar as it relates to purely de facto segregation, unaided by any state action, it is the law of this circuit, Bell v. School City of Gary, Indiana, 324 F.2d 209 (7th Cir. 1963), aff'g 213 F.Supp. 819 (N.D. Ind.1963)."
 
 
 786
 A similar prayer for re-districting was before the District Court in Spencer v. Kugler, 326 F.Supp. 1235 (D.N.J. 1971), and was rejected. The Supreme Court affirmed without opinion, 404 U. S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972) with Mr. Justice Douglas dissenting.
 
 
 787
 While the Fifth Circuit in Cisneros v. Corpus Christi Independent School District, 467 F.2d 142 (5th Cir. 1972), en banc, sustained a finding of unconstitutional segregation resulting from a neighborhood school policy which effectively segregated Mexican-Americans within a school district it did so based upon competent evidence.
 
 
 788
 The majority here announces, "If school boundary lines cannot be changed for an unconstitutional purpose, it follows logically that existing boundary lines cannot be frozen for an unconstitutional purpose." (P. 251). Again it may be that this will become the law. Clearly, the cases cited have reached this conclusion as to the attendance lines existing within a specific school system. I know of no case which permits such a conclusion as to boundary lines existing between school districts, and while the conclusion that existing boundary lines cannot be frozen for an unconstitutional purpose may flow logically from the premise announced it should be based upon competent evidence justifying a finding of fact that such boundary lines have been frozen for an unconstitutional purpose, and the District Judge in this case announced that he took no evidence on that issue.
 
 
 789
 I do not understand how the majority can reach a conclusion as to an appropriate remedy without evidence of any violation, particularly when in Deal I and Deal II a contrary conclusion has been reached. As stated at 369 F.2d, page 59:
 
 
 790
 "If the state or any of its agencies has not adopted impermissible racial criteria in its treatment of individuals then there is no violation of the Constitution."
 
 
 791
 and again in Davis this Court framed the issues as follows:
 
 
 792
 "Accordingly, the principal question before us is whether there is sufficient evidence in the record to support the determination of the District Judge that appellants are responsible for the existing racial imbalance in the Pontiac School System." 443 F.2d at 575. (Emphasis supplied).
 
 
 793
 and in responding to that issue this Court said:
 
 
 794
 "Although, as the District Court stated, each decision considered alone might not compel the conclusion that the Board of Education intended to foster segregation, taken together, they support the conclusion that a purposeful pattern of racial discrimination has existed in the Pontiac school system for at least 15 years." 443 F.2d at 576.
 
 
 795
 Thus, the cases in this Court, prior to this case, appear conclusively to have been decided on the basis of discriminatory intent, and unless we specifically reverse our previous decisions we cannot reach the conclusion announced by the majority in a case where the District Court specifically stated that it did not take any evidence to establish any discriminatory intent on the part of the suburban school districts who were not parties to the action or on the part of the State in the structure of the suburban school districts.
 
 
 796
 Other circuits have also required the establishment of a discriminatory intent. Keyes v. School District No. 1, Denver, Colorado, 445 F.2d 990 (10th Cir. 1971), cert. granted 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728 (1972); Bell v. School City of Gary, Indiana, 324 F.2d 209 (7th Cir. 1963), cert. denied 377 U. S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964); United States v. School District 151, Cook County, Ill., 404 F.2d 1125 (7th Cir. 1968), cert. denied 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971); United States v. Board of School Commissioners of Indianapolis, Indiana, 474 F.2d 81 (7th Cir. 1973); Spencer v. Kugler, 326 F.Supp. 1235 (D.N.J.1971), aff'd 400 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972). But see: United States v. Texas Education Agency, 467 F.2d 848 (5th Cir. 1972).
 
 
 797
 The evidence in regard to building of school buildings within the City of Detroit and lack of state aid for transportation of pupils within the City of Detroit may have demonstrated that these factors contributed to racial segregation within the City of Detroit. Clearly, if the Court took no proofs with respect to the commission of acts causing segregation of the races as between the City of Detroit and the suburban school districts it would be inappropriate to include those school districts within any remedy to be adopted to eliminate segregation within the City of Detroit. The cases cited by the District Court and by the majority of this Court are inapplicable. In each case cited the school district involved and against which a remedial order was granted was found to have been guilty of segregative practices. In every instance, as we read the cases, that finding was supported by substantial evidence after an adversary proceeding in which all the interested parties were represented. Such is not the case here.
 
 
 798
 It seems obvious to me that the majority and the District Court have become confused and are unable to distinguish between violation and remedy. As stated by the District Court no evidence was taken as to any violation in the fixing of the boundaries of the suburban school systems nor as to any violation because of the relationship between the suburban school systems and the schools of the City of Detroit.
 
 
 799
 The errors to which we have already alluded were brought about by the failure on the part of the District Court to require that all interested parties be brought into the case at the earliest appropriate moment. A review of this record reveals that on March 22, 1971, a group of white Detroit residents, who were parents of children enrolled in the Detroit public schools, were permitted to intervene as parties defendant. On June 24, 1971, the District Judge alluded to the possibility of a metropolitan school system, App. Vol. IV, pgs. 259, 260, and in that connection stated: "As I have said to several witnesses in this case: how do you desegregate a black city, or a black school system." App. Vol. IV, pg. 260. Subsequently, and on July 17, 1971, the white parents filed a motion in an effort to require the joinder of the 85 suburban school districts as parties defendant and gave the following reasons:
 
 
 800
 "1. That said suburban school districts are agents of the State of Michigan and subject to the jurisdiction and supervision of the State Board of Education.
 
 
 801
 "2. That said school districts are white segregated school districts.
 
 
 802
 "3. That questions of law and fact common to the defendant, School District of the City of Detroit, and proposed additional suburban school districts have been presented to this Court.
 
 
 803
 "4. In the event that this Court rules for the plaintiff, in the absence of joinder of the proposed school districts, complete relief cannot be awarded the plaintiff, and in addition would impose an unconstitutional burden on the intervening defendant, in that the resulting school district of the City of Detroit would be and will remain as established by the proofs already submitted an inferior school district." App. I at 142-3.
 
 
 804
 The trial court did not rule upon this motion, but in the course of the proceedings discussed it in September, 1971, and concluded that the motion should not be considered at that time because "in considering the motion to add the listed school districts we pause to note that the proposed action has to do with relief." App. Vol. I, pg. 215, 338 F. Supp. 582, at 595.
 
 
 805
 Between February 9 and February 17, 1972, four parties, Grosse Pointe Public Schools, Allen Park Public Schools, et al.,[1] Southfield Public Schools and the School District for the City of Royal Oak, made motions for leave to intervene. These motions were finally granted on March 15, 1972, during the second day of hearing on the plans for desegregation involving only the Detroit school system. Intervention, according to the District Judge, was permitted under Rule 24(a), "Intervention of Right," and also under Rule 24(b), "Permissive Intervention." Before permitting such intervention and on March 6, 1972, the District Judge set up a timetable for the consideration of plans already submitted, which timetable was as follows:
 
 
 806
 "1. Hearing on desegregation intra-city plans will proceed, beginning at 10:00 a. m., Tuesday, March 14, 1972.
 
 
 807
 "2. Recommendations for 'conditions' of intervention to be submitted not later than 10:00 a. m., March 14, 1972."3. Briefs on propriety of metropolitan remedy to be submitted not later than March 22, 1972.
 
 
 808
 "4. Tentatively and unless the court rules otherwise, hearings on metropolitan remedy to commence 10:00 a. m., March 28, 1972." App. I at 397.
 
 
 809
 When intervention was granted, the District Judge placed strict limitations upon the part which the intervenors would be permitted to play. The order provides:
 
 
 810
 "The interventions granted this day shall be subject to the following conditions:
 
 
 811
 1. No intervenor will be permitted to assert any claim or defense previously adjudicated by the court.
 
 
 812
 2. No intervenor shall reopen any question or issue which has previously been decided by the court.
 
 
 813
 3. The participation of the intervenors considered this day shall be subordinated to that of the original parties and previous intervenors.
 
 
 814
 4. The new intervenors shall not initiate discovery proceedings except by permission of the court upon application in writing, accompanied by a showing that no present party plans to or is willing to undertake the particular discovery sought and that the particular matter to be discovered is relevant to the current stage of the proceedings.
 
 
 815
 5. No new intervenor shall be permitted to seek a delay of any proceeding in this cause; and he shall be bound by the brief and hearing schedule established by the court's Notice to Counsel, issued March 6, 1972.
 
 
 816
 6. New intervenors will not file counterclaims or cross-complaints; nor will they be permitted to seek the joinder of additional parties or the dismissal of present parties, except upon a showing that such action will not result in delay.
 
 
 817
 7. New intervenors are granted intervention for two principal purposes: (a) To advise the court, by brief, of the legal propriety or impropriety of considering a metropolitan plan; (b) To review any plan or plans for the desegregation of the so-called larger Detroit Metropolitan area, and submitting objections, modifications or alternatives to it or them, and in accordance with the requirements of the United States Constitution and the prior orders of this court.
 
 
 818
 8. New intervenors shall present evidence, if any they have, through witnesses to a number to be set, and limited, if necessary, by the court, following conference.
 
 
 819
 9. With regard to the examination of witnesses, all new intervenors shall among themselves select one attorney per witness to act for them, unless one or more of the new intervenors show cause otherwise.
 
 
 820
 These conditions of intervention shall remain subject to change or modification by the court in the interest of timely disposition of the case." App. Ia 408-410.
 
 
 821
 We point out that the intervening school districts (42 out of 85) came into the case while the court was already considering the Detroit only plans, were permitted a total of less than one week to prepare briefs in regard to a metropolitan remedy, and found themselves faced with a ruling favorable to the consideration of such remedy within two days after the date on which their briefs were due. All of this despite the fact that an effort had been made to bring the suburban school districts into the case almost eight months prior to the rulings in regard to the Detroit only plans and the metropolitan plan. The majority finds no fault with this timetable. It affirms the conclusions of the District Court in regard to the Detroit only plan and the need for a metropolitan plan without affording to the suburban school districts any opportunity to be heard.
 
 
 822
 Those suburban school districts which are not yet parties to this action, 43 in number, have had no opportunity to be heard with respect to any alleged constitutional violation within their respective school districts or with respect to the existence of their respective school district boundaries. Of course, the pleadings do not assert any such violations but under the majority opinion a remedy will be imposed which will drastically affect the future schooling of their children without granting to them any opportunity to be heard with regard to any reasons which might support the adoption of such a remedy. The suburban school districts which were belatedly made parties to this action assert that because they have not been afforded the opportunity to offer evidence to demonstrate that they have not been guilty of any constitutional violation they have been denied the fundamental requirements of due process. The response of the appellee to the claimed rights of the suburban school districts is that there is no denial of "life, liberty or property" within the meaning of the Fifth Amendment. They also claim that the interests of the suburban school districts were adequately represented by "their parent state defendant."
 
 
 823
 An examination of the record in this case will effectively dispose of any claim that the interests of the suburban school districts were represented by the state defendants. Clearly, the state defendants were defending against the claims of the plaintiffs that the state had by its actions created racial segregation within the school district of the City of Detroit. As I examine the record it does not appear that any defendant felt compelled to offer evidence in defense of an unasserted claim that the existence of suburban school districts was without other evidence a violation of the constitutional rights of the students in the schools of the City of Detroit. Had the state defendants comprehended that the District Court intended to impose a metropolitan school district upon the schools of three counties the writer is confident that they would have joined in the earlier motion to require the suburban school districts to be named as parties defendant.
 
 
 824
 As to the first argument of the appellees it is clear from the language of the Court in Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), that the segregation of schools is a denial of due process within the meaning of the Fifth Amendment. If segregation is a denial of the Fifth Amendment due process then clearly orders eliminating such segregation are a part of the due process rights. In that case the Court said:
 
 
 825
 "Although the Court has not assumed to define 'liberty' with any great precision, that term is not confined to mere freedom from bodily restraint. Liberty under law extends to the full range of conduct which the individual is free to pursue, * * *." 347 U.S. at 499, 74 S.Ct. at 694.
 
 
 826
 Even earlier, in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the Supreme Court found a violation of the Fourteenth Amendment in matters relating to the liberty of parents to direct the upbringing and education of children under their control. Had we any doubt, it would have been settled in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), where the Court permitted parents to withdraw their children from the state public school system and found a constitutional right in parents to control the upbringing and religious training of their children. That the right under the Fifth Amendment applies to the states was recognized in Griswold v. Connecticut, 381 U.S. 479, at page 482, 85 S.Ct. 1678 at page 1680, 14 L.Ed.2d 510 (1965), where the court noted:
 
 
 827
 "By Pierce v. Society of Sisters, supra, the right to educate one's children as one chooses is made applicable to the States by the force of the First and Fourteenth Amendments."
 
 
 828
 Being convinced that the interest of parents in the education of their children represents a right protected by the Constitution as to all parents and not only those parents whose children are required to attend segregated schools, we then reach the question of the application of due process to that right.
 
 
 829
 As pointed out by the Court in Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965):
 
 
 830
 "A fundamental requirement of due process is 'the opportunity to be heard.' * * * It is an opportunity which must be granted at a meaningful time and in a meaningful manner."
 
 
 831
 and in greater detail we find the same principal in Boddie v. Connecticut, 401 U.S. 371, 377-378, 91 S.Ct. 780, 785, 28 L.Ed.2d 113 (1971), where Mr. Justice Harlan, speaking for the Court, stated:
 
 
 832
 "Prior cases establish, first, that due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard. Early in our jurisprudence, this Court voiced the doctrine that '[w]herever one is assailed in his person or his property, there he may defend,' Windsor v. McVeigh, 93 U.S. 274, 277, 23 L.Ed. 914 (1876). See Baldwin v. Hale, 1 Wall. 223, 17 L.Ed. 531 (1864); Hovey v. Elliott, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897). The theme that 'due process of law signifies a right to be heard in one's defense,' Hovey v. Elliott, supra, at 417, 17 S. Ct. 841, has continually recurred in the years since Baldwin, Windsor, and Hovey. Although '[m]any controversies have raged about the cryptic and abstract words of the Due Process Clause,' as Mr. Justice Jackson wrote for the Court in Mullane v. Central Hanover Tr. Co., 339 U.S. 306, 70 S. Ct. 652, 94 L.Ed. 865 (1950), 'there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case."' Id., at 313, 70 S.Ct. 656.
 
 
 833
 Thus, each party to a lawsuit should be advised as to the claims asserted by the other parties to the lawsuit and have an opportunity to be heard in respect to all such claims.
 
 
 834
 In this case no pleading has ever been filed suggesting any wrongdoing on the part of any suburban school district, none suggesting that the suburban schools and the schools of the City of Detroit constituted a dual school system or even intimating any possibility of a need for a metropolitan school district to eliminate the segregated conditions alleged to have existed in the schools of the City of Detroit. We can only speculate upon the timing of the first suggestion of a metropolitan district but it appears that the District Judge seized upon the suggestion without requiring any amendments to the pleadings or the adding of any parties.
 
 
 835
 I question whether the suburban school districts have any interest in being heard as to the claim of segregation within the City of Detroit, and there can be no question as to the right of the trial court to place certain limitations upon the part which any intervening school district would be permitted to play. Had all of this, in regard to metropolitan school districts, come up at the eleventh hour as suggested by the appellees one might, although it is doubtful, accept the conditions imposed by the District Judge. Such was not the case here. The motion to require the joinder of the suburban school districts was made almost eight months before consideration was given to the Detroit only plans.
 
 
 836
 The Advisory Committee on the Rules anticipated that limitations and conditions might be placed upon intervention as a matter of right under Rule 24(a):
 
 
 837
 "An intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings." 3B Moore's Federal Practice p 24.01 , at 24-18 (2d Ed.).
 
 
 838
 and see also Galbreath v. Metropolitan Trust Co. of California, 134 F.2d 569, 570 (10th Cir. 1943); Chavis v. Whitcomb, 305 F.Supp. 1359, 1363 (S.D.Ind. 1969). The situation in this case is pointed up by the language found at 3B Moore's Federal Practice p 24.16 , 2d Ed.
 
 
 839
 "It would be meaningless to give him an absolute right to intervene in order to protect his interest, if once in the proceeding he were barred from raising questions necessary to his own protection."
 
 
 840
 What we have said in regard to intervention under Rule 24 sets forth without the necessity of repetition those matters which should be considered by any court in determining the part which is to be played by one who is joined as a party under Rule 19, as well as one who intervenes as a party, aspects of this case which are almost completely ignored by the majority and the District Court.
 
 
 841
 In conclusion I am constrained to say that I do not suggest that a metropolitan remedy is totally beyond the realm of consideration in this case upon an appropriate record. My whole purpose in writing this opinion is to point out that the majority and the District Court have fallen into a state of confusion in failing to distinguish between violation and remedy and in failing to recognize the necessity for the finding of violation before the trial court embarks upon that broad field of equity which permits a trial judge to devise a remedy which will adequately overcome the violation previously found to be in existence. I have also written because I am satisfied that the District Judge in failing to consider the necessity for joining the suburban school districts pursuant to a motion filed more than a year before the disposition of the case was in error. The suggestion by the District Court that the suburban school districts were only involved in the remedy points up the trap into which both the District Court and the majority of this Court have fallen in failing to recognize the necessity for finding a violation before a remedy may be imposed.
 
 
 842
 I would reverse the District Court and remand the case with instructions to require the joinder of the suburban school districts of the counties of Wayne, Oakland and Macomb with permission to the representatives of those districts, with reasonable limitations, to participate in all aspects of this lawsuit which may affect the suburban school districts, and with particular attention to the necessity for finding a constitutional violation which would justify the imposition of a metropolitan remedy.
 
 
 843
 WILLIAM E. MILLER, Circuit Judge (dissenting).
 
 
 844
 It is my firm conviction that it is premature at this time for the Court to adjudicate any of the questions arising from the various orders of the district court from which this appeal is taken. This is true for the reason that school districts and parties to be affected by a metropolitan plan or remedy have not been afforded an opportunity to be heard or to present evidence upon all of the issues involved.
 
 The majority opinion does indeed state:
 
 845
 On remand, any party against whom relief is sought, including school districts which heretofore have intervened and school districts which hereafter may become parties to this litigation, shall be afforded an opportunity to offer additional evidence, and to cross-examine available witnesses who previously have testified, on any issue raised by the pleadings, including amendments thereto, as may be relevant and admissible to such issues. The District Court may consider any evidence now on file and such additional competent evidence as may be introduced by any party.
 
 
 846
 The effect of this conclusion is, in my opinion, vitiated by the two succeeding sentences:
 
 
 847
 However, the District Court will not be required to receive any additional evidence as to the matters contained in its Ruling on the Issue of Segregation, dated September 27, 1971, and reported at 338 F.Supp. 582, or its Findings of Fact and Conclusions of Law on the "Detroit-only" plans of desegregation, dated March 28, 1972. We hold that the findings of fact contained in these rulings are not clearly erroneous, Rule 52(a), Fed.R.Civ.P., but to the contrary are supported by substantial evidence.
 
 
 848
 Parties to be affected and against whom relief is sought should be accorded, in compliance with basic principles of due process, an opportunity to be heard at a meaningful time and in a meaningful manner not only with respect to the ultimate scope of the remedy to be fashioned, but also with respect to important, significant and perhaps even controlling issues, including the issue of segregation, a "Detroit only" school plan and the propriety of a metropolitan remedy. If any one of these issues is resolved in favor of parties outside the Detroit School District, the nature and scope of a remedy embracing outlying districts would not be reached. Hence the outlying districts have a vital interest in each issue separately and should be heard on each in a true adversary sense. Until this is done our expression of view on the merits of the several questions is uncalled for and ill-advised. To permit these additional parties to be heard only in the restricted sense set forth in the majority opinion is to deny them basic rights guaranteed not only by Rule 19, Federal Rules of Civil Procedure, but by the Constitution itself.
 
 
 849
 I would, therefore, vacate all orders appealed from the district court, remand the action for the joinder of all parties to be affected, and direct the district court to afford the parties a proper opportunity to be heard and to present evidence on the issues indicated above.
 
 
 
 "1. Bradley v. Richmond, supra [slip opinion p. 68].
 "2. Brown v. Bd. of Ed. of Topeka, 349 U.S. 294, pp. 300-301 [75 S.Ct. 753].
 "3. Haney v. County Board of Education of Sevier County, 410 F.2d 920 (8th Cir. 1969); Bradley v. School Board of the City of Richmond, supra, slip opinion pp. 664-65; Hall v. St. Helena Parish School Board, 197 F.Supp. 649 (E.D.La. 1961), aff'd, 287 F.2d 376 (5th Cir. 1961) and 368 U.S. 515 [82 S.Ct. 529, 7 L.Ed.2d 521] (1962); Lee v. Macon County Bd. of Educ., 448 F.2d 746, 752 (5th Cir. 1971); Gomillion v. Lightfoot, 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110] (1960); Turner v. Littleton-Lake Gaston School Dist., 442 F.2d 584 (4th Cir. 1971); United States v. Texas, 447 F. 2d 551 (5th Cir. 1971); Lemon v. Bossier Parish School Board, 446 F.2d 911 (5th Cir. 1971)."
 
 
 [1]
 M.S.A. Sec. 15.3252(c), M.C.L.A. Sec. 340.252 (c)
 
 
 [2]
 M.S.A. Sec. 15.3575, M.C.L.A. Sec. 340575
 
 
 [3]
 M.S.A. Secs. 15.1023(10)(a), 15.3570 M.C.L.A. Secs. 388.1010(a), 340.570
 
 
 [4]
 M.S.A. Secs. 15.1951, 15.3361, M.C.L.A. Secs. 388.371, 340.361; M.S.A. Secs. 15.3781-15.3782, M.C.L.A. Secs. 340.781-340.782; M.S.A. Sec. 9.2511(c), M.C.L.A. Sec. 257.811 (c)
 
 
 [5]
 M.S.A. Sec. 15.3732(g), M.C.L.A. Sec. 340.732 (g)
 
 
 [6]
 M.S.A. Sec. 15.3789, M.C.L.A. Sec. 340.789
 
 
 [7]
 M.S.A. Sec. 15.3612, M.C.L.A. Sec. 340.612; M.S.A. Secs. 15.3616, 15.3688, M.C.L.A. Secs. 340.616, 340.688
 
 
 [8]
 M.S.A. Sec. 15.3887(1), M.C.L.A. Sec. 340.887(1)
 
 
 [9]
 M.S.A. Sec. 15.3402, M.C.L.A. Sec. 340.402
 
 
 [10]
 M.S.A. Sec. 15.3431, M.C.L.A. Sec. 340.431
 
 
 [11]
 M.S.A. Sec. 15.3447, M.C.L.A. Sec. 340.447
 
 
 [12]
 M.S.A. Sec. 15.3567(1), M.C.L.A. Sec. 340.567(a)
 
 
 [13]
 M.S.A. Sec. 15.1961, M.C.L.A. Sec. 388.851, Op.Atty.Gen. No. 1837, 1952-1954 Report of the Attorney General 440 (Nov. 8, 1954)
 
 
 [4]
 See Alexander v. Hillman, 296 U.S. 222, 239, 56 S.Ct. 204, 80 L.Ed. 192
 
 
 [5]
 See Hecht Co. v. Bowles, 321 U.S. 321, 329-330, 64 S.Ct. 587, 88 L.Ed. 754
 
 
 [1]
 While the present undefined desegregation area consists of three additional counties and 53 school districts, this could, of course, be expanded so as to include as many as the District Judge may order. The plan seeks to achieve a racial balance or quota in each public school in the system of 75% white and 25% black in a state which is 87% white and 13% black. The Plan violates Public Acts of Michigan, 1867, Act 34 Sec. 28, by ordering children living in one district to attend school in another district
 
 
 [2]
 The Supreme Court in Jones v. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), has since held that Section 1982 of 42 U.S.C. applies to all discrimination in the sale or rental of property
 The majority distinguishes Deal I on the ground that the District Court made findings of fact that there had been no unconstitutional conduct on the part of the Cincinnati Board of Education. In Bradley, the District Judge had found similar facts to constitute a violation of the Constitution. Both District Court decisions, although inconsistent, have now been affirmed.
 
 
 [3]
 Indeed, there is no finding by the District Court of any pattern of purposeful segregation by the School Board or finding of any causal relationship between any alleged segregative acts of the Board of Education and the concentration of blacks in the inner city
 
 
 [4]
 At the National Black Political Convention held in Gary, Indiana (March, 1972), mandatory busing and school integration were condemned as racist and as preserving a black minority structure
 
 
 [5]
 Of course, merely because equal protection is an individual right does not mean, as implied in United States v. Jefferson Co. Bd. of Education, 372 F.2d 836 (5th Cir. 1966), that a class action will not be available under Rule 23(a) for redress of discrimination. A class action lies where a number of persons have similar individual rights infringed
 On the other hand, it does not follow that simply because a class action is available to redress discrimination individual rights can be obliterated by superimposing the "rights" of the class.
 The individual plaintiffs, who charge in their Complaint the maintenance of a desegregated school system in Detroit, were all Negroes except one. Nevertheless, the District Court in determining the class held "that the plaintiffs in their action represent all school children in the City of Detroit, Michigan, and all Detroit resident parents who have children of school age, . . .." Thus white and black children and their parents, who are not situated similarly with the plaintiffs and may violently disagree with plaintiffs' position, are arbitrarily placed in the same class. It will also be noted that the Complaint sought only the desegregation of the Detroit schools and made no claim against other counties and other school districts.
 
 
 [6]
 "The interventions granted this day shall be subject to the following conditions:
 
 
 [1]
 No intervenor will be permitted to assert any claim or defense previously adjudicated by the court
 
 
 [2]
 No intervenor shall reopen any question or issue which has previously been decided by the court
 
 
 [3]
 The participation of the intervenors considered this day shall be subordinated to that of the original parties and previous intervenors
 
 
 [4]
 The new intervenors shall not initiate discovery proceedings except by permission of the court upon application in writing, accompanied by a showing that no present party plans to or is willing to undertake the particular discovery sought and that the particular matter to be discovered is relevant to the current stage of the proceedings
 
 
 [5]
 No new intervenor shall be permitted to seek a delay of any proceeding in this cause; and he shall be bound by the brief and hearing schedule established by the court's Notice to Counsel, issued March 6, 1972
 
 
 [6]
 New intervenors will not file counterclaims or cross-complaints; nor will they be permitted to seek the joinder of additional parties or the dismissal of present parties, except upon a showing that such action will not result in delay
 
 
 [7]
 New intervenors are granted intervention for two principal purposes: (a) To advise the court, by brief, of the legal propriety or impropriety of considering a metropolitan plan; (b) to review any plan or plans for the desegregation of the so-called larger Detroit Metropolitan area, and submitting objections, modifications or alternatives to it or them, and in accordance with the requirements of the United States Constitution and the prior orders of this court
 
 
 [8]
 New intervenors shall present evidence, if any they have, through witnesses to a number to be set, and limited, if necessary, by the court, following conference
 
 
 [9]
 With regard to the examination of witnesses, all new intervenors shall among themselves select one attorney per witness to act for them, unless one or more of the new intervenors show cause otherwise. These conditions of intervention shall remain subject to change or modification by the court in the interest of timely disposition of the case
 DATE: March 15, 1972." App. at 408-410.
 
 
 [7]
 Judge Roth's language is not understandable in view of the 1869 decision of the Supreme Court of Michigan in People, ex rel. Workman v. Board of Education of Detroit, supra, upholding the right of Negro children to attend any school in their district
 
 
 [8]
 The orders entered by the District Court have certainly been expended on the public treasury, have interfered with public administration, have restrained the State from acting, and have compelled it to act, which is the test for determining whether the action is against the State, under Dugan v. Rank, supra. Such an action is clearly proscribed by the Eleventh Amendment
 
 
 [1]
 Editorial, "Discrimination by HEW," New York Times, March 2, 1972
 
 
 [1]
 The others referred to included 38 additional suburban school districts